UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DENNIS GOVER,

        Petitioner,

                              CASE NO. 2:06-CV-15184
    v.                              JUDGE STEPHEN J. MURPHY, III
                                MAGISTRATE JUDGE PAUL J. KOMIVES

DOUGLAS VASBINDER,

        Respondent.

_____/


# REPORT AND RECOMMENDATION


*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    D.    *Denial of Continuance (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    E.    *Evidentiary Claims (Claims III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    F.    *Involuntary Confession (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    G.    *Confrontation (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        1.    *Hearsay Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        2.    *Limits on Cross-Examination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    H.    *Prosecutorial/Judicial Misconduct (Claims VII & VIII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
            a. Denigration of Defense Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
            b. Prosecutorial Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    I.     *Jury Instructions (Claims IX & XI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
        2.    *Failure to Give Lesser Offense Instructions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
        3.    *Response to Jury Note* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

|       |       | b. Analysis ............................................................. | 59 |
| J. | | *Sufficiency of the Evidence (Claim X)* ........................................ | 62 |
| | 1. | *Clearly Established Law* .................................................. | 62 |
| | 2. | *Analysis* ............................................................. | 65 |
| K. | | *Sentencing Claims (Claims XII and XIII)* ..................................... | 71 |
| | 1. | *Biased Sentencing Judge (Claim XII)* ...................................... | 71 |
| | | a. Clearly Established Law ................................................ | 71 |
| | | b. Analysis ............................................................. | 73 |
| | 2. | *Sentencing Based on Failure to Admit Guilt (Claim XIII)* ..................... | 74 |
| | | a. Analysis ............................................................. | 74 |
| | | b. Exhaustion ........................................................... | 77 |
| L. | | *Counsel Claims (Claims I, XI & XIV)* ......................................... | 79 |
| | 1. | *Denial of Counsel of Choice (Claim I)* ..................................... | 80 |
| | | a. Clearly Established Law ................................................ | 80 |
| | | b. Analysis ............................................................. | 81 |
| | 2. | *Ineffective Assistance of Counsel (Claims XI & XIV)* ......................... | 83 |
| | | a. Clearly Established Law ................................................ | 83 |
| | | b. Failure to Request Manslaughter Instruction (Claim XI) ..................... | 84 |
| | | c. Failure to Investigate Alibi Defense (Claim XIV) ........................... | 85 |
| M. | | *Conclusion* ................................................................ | 89 |
| III. | | NOTICE TO PARTIES REGARDING OBJECTIONS .................................... | 89 |

*       *       *       *       *

I.     <u>RECOMMENDATION</u>: The Court should grant in part and deny petitioner's application for the writ of habeas corpus.  Specifically, the Court should grant petitioner's application with respect to his claim that the trial court's sentence was impermissibly based on his failure to admit guilt, in violation of his Fifth Amendment privilege against self-incrimination.  Accordingly, the Court should grant a conditional writ of habeas corpus, ordering the State to release petitioner if it does not provide him a new sentencing proceeding before another judge within 180 days of the Court's order.  In all other respects, the Court should deny petitioner's application.

II.    <u>REPORT</u>:

A.     *Procedural History*

1.     Petitioner Dennis Gover is a state prisoner, currently confined at the Newberry Correctional Facility in Newberry, Michigan.

2.     Petitioner was convicted of second degree murder, MICH. COMP. LAWS § 750.317;

2

two counts of assault with intent to commit murder, MICH. COMP. LAWS § 750.83; intentional discharge of a firearm at a dwelling, MICH. COMP. LAWS § 750.234b; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court.  On January 31, 1997, he was sentenced to concurrent terms of 60-100 years' imprisonment on the murder conviction, 20-60 years' imprisonment on the assault convictions, and 2-4 years' imprisonment on the discharge of a firearm conviction, as well as to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      IT WAS REVERSIBLE ERROR AND A DENIAL OF DUE PROCESS AND A FAIR TRIAL FOR THE TRIAL COURT TO DENY DEFENDANT'S REQUEST FOR INSTRUCTIONS ON INVOLUNTARY MANSLAUGHTER AND RECKLESS DISCHARGE OF A FIREARM. US CONST. AM XIV.

II.     DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO COUNSEL BY THE ERRONEOUS DISMISSAL OF HIS ATTORNEY OF CHOICE.  US CONST AM V.

III.    THE TRIAL COURT DENIED DEFENDANT HIS RIGHT TO DUE PROCESS OF LAW BY DENYING HIS MOTION FOR MISTRIAL BASED ON INCURABLE, PREJUDICIAL ERROR INJECTED BY THE PROSECUTOR WHICH IMPUGNED MR. GOVER'S CHARACTER. US CONST AM XIV.

IV.     THE EVIDENCE OF FIRST DEGREE MURDER WAS INSUFFICIENT AND IT WAS ERROR AND A DENIAL OF DUE PROCESS TO DENY THE MOTION TO REDUCE THE CHARGE AND THE MOTION FOR DIRECTED VERDICT, AND IT WAS ERROR TO INSTRUCT THE JURY ON "TRANSFERRED INTENT."  US CONST AM XIV.

V.      DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL BY THE INTRODUCTION, OVER OBJECTION, OF A GREAT DEAL OF TESTIMONY REGARDING ALLEGED THREATS WHICH WERE NEVER CONNECTED TO DEFENDANT, AND BY THE IRRELEVANT

3

AND INFLAMMATORY UNSUPPORTED ALLEGATION THAT DEFENDANT WAS A MEMBER OF A GANG.  US CONST AM XIV.

    A.    ADMISSION OF THE ALLEGATIONS OF THREATS WHICH WERE UNCONNECTED TO DEFENDANT DENIED HIM A FAIR TRIAL.

    B.    THE REFERENCE TO THE GANG WAS UNFAIRLY PREJUDICIAL.

VI.    THE TRIAL COURT CLEARLY ERRED AND DENIED DEFENDANT DUE PROCESS OF LAW BY DENYING HIS MOTION TO SUPPRESS HIS CONFESSION.  US CONST AM V, XIV.

VII.    DEFENDANT WAS DENIED A FAIR TRIAL BY THE TRIAL COURT AND THE PROSECUTOR REPEATEDLY DENIGRATING DEFENSE COUNSEL IN FRONT OF THE JURY, AT ONE POINT THREATENING TO HOLD COUNSEL IN CONTEMPT OF COURT. US CONST AM XIV.

VIII.    DEFENDANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY THE INTRODUCTION, OVER OBJECTION, OF HIGHLY INFLAMMATORY HEARSAY EVIDENCE WHICH WAS NOT ADMISSIBLE UNDER THE CO-CONSPIRATOR, OR ANY OTHER EXCEPTION TO THE HEARSAY RULE; DEFENDANT WAS DENIED HIS RIGHT OF CONFRONTATION BY THE TRIAL COURT'S BIASED RULINGS RESTRICTING CROSS-EXAMINATION.  US CONST AM VI, XIV

    A.    HEARSAY WAS IMPROPERLY ADMITTED OVER OBJECTION.

    B.    DEFENDANT WAS DENIED HIS RIGHT TO CROSS EXAMINE PROSECUTION WITNESSES.

IX.    DEFENDANT WAS DENIED DUE PROCESS OF LAW BY THE CUMULATIVE EFFECT OF PROSECUTORIAL MISCONDUCT.  US CONST AM XIV.

X.    DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO BE SENTENCED BY A NEUTRAL AND DETACHED SENTENCING JUDGE.  US CONST AM XIV.

XI.    DEFENDANT MUST BE RESENTENCED BY A DIFFERENT JUDGE BECAUSE THE SENTENCING JUDGE BASED HER DEPARTURE

FROM THE GUIDELINES ON DEFENDANT'S FAILURE TO ADMIT GUILT AND BECAUSE HIS SENTENCE OF 60 TO 100 YEARS IS DISPROPORTIONATE AND CRUEL AND UNUSUAL PUNISHMENT. US CONST AM VIII.

A.   THE SENTENCING COURT IMPROPERLY DEPARTED FROM THE GUIDELINES BASED ON THE IMPROPER CONSIDERATION OF DEFENDANT'S FAILURE TO ADMIT GUILT AND HIS ALLEGED LACK OF REMORSE.

B.   THE SENTENCE OF 60 TO 100 YEARS IS DISPROPORTIONATE.

XII.   DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL BY THE DENIAL OF HIS MOTION FOR MISTRIAL, BY TRIAL COUNSEL'S FAILURE TO REQUEST AN INSTRUCTION ON VOLUNTARY MANSLAUGHTER, AND BY THE TRIAL COURT'S FAILURE TO GIVE THAT INSTRUCTION SUA SPONTE IN LIGHT OF THE JURY'S FINDINGS AS EXPRESSED IN NOTES TO THE COURT.  US CONST AM XIV.

A.   DEFENDANT WAS DENIED A FAIR TRIAL AND THE VERDICT WAS COERCED BY THE TRIAL COURT'S REFUSAL TO GRANT THE MISTRIAL.

B.   THE TRIAL COURT SHOULD HAVE SUA SPONTE INSTRUCTED THE JURY ON VOLUNTARY MANSLAUGHTER; ALTERNATIVELY, DEFENDANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ATTORNEY'S FAILURE TO REQUEST THAT INSTRUCTION.

XIII.   THE TRIAL COURT DENIED DEFENDANT HIS RIGHT TO DUE PROCESS OF LAW, EQUAL PROTECTION, HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, AND HIS RIGHT OF CONFRONTATION BY DENYING HIS MOTION FOR A CONTINUANCE.  US CONST AM VI, XIV.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Gover*, No. 203768, 1999 WL 33437846 (Mich. Ct. App. Aug. 17, 1999) (per curiam).

4.   Petitioner sought leave to appeal these issues to the Michigan Supreme Court, as well

as an additional claim challenging the trial court's jurisdiction. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Gover*, 463 Mich. 853, 617 N.W.2d 335 (2000).

5. On July 31, 2001, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I. DEFENDANT WAS DENIED BOTH MICHIGAN AND FEDERAL CONSTITUTIONAL RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL: WHERE APPELLATE COUNSEL DID NOT RAISE THE BELOW ISSUES IN HIS APPEAL OF RIGHT.

II. DEFENDANT-APPELLANT GOVER WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL: WHERE TRIAL COURT FAILED TO INVESTIGATE.

III. THE TRIAL COURT LACKED JURISDICTION TO TRY THIS CASE BECAUSE THE DISTRICT COURT JUDGE FILED A VOID PREDATED RETURN IN VIOLATION OF DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND MICHIGAN CONSTITUTION OF 1963 ARTICLE 1, SECTION. [sic]

IV. TRIAL COURT VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS WHEN IT DEPARTED FROM THE GUIDELINES BASED ON ERRONEOUS AND UNSUBSTANTIATED INFORMATION IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENT[S] OF THE UNITED STATES CONSTITUTION AND PARALLEL PROVISION[S] OF MICHIGAN CONSTITUTION.

On July 9, 2004, the trial court denied petitioner's motion for relief from judgment, concluding that petitioner had failed to establish good cause for his failure to raise his claims on direct appeal as required by MICH. CT. R. 6.508(D)(3). *See People v. Gover*, No. 94-13688-01 (Wayne County, Mich., Cir. Ct. July 9, 2004). The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet

the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Gover*, 476 Mich.

866, 720 N.W.2d 310 (2006); *People v. Gover*, No. 263575 (Mich. Ct. App. Mar. 9, 2006).

      6.      Petitioner, through counsel, filed the instant application for a writ of habeas corpus

on November 20, 2006.  As grounds for the writ of habeas corpus, he raises the following claims:

I.      A NEW TRIAL IS REQUIRED WHERE THE TRIAL COURT INTERFERED WITH PETITIONER'S RIGHT TO COUNSEL.

II.      PETITIONER DENIED A FAIR TRIAL WHERE THE TRIAL COURT DENIED A REQUEST FOR CONTINUANCE TO OBTAIN TRANSCRIPTS NECESSARY FOR THE DEFENSE.

III.      PETITIONER DENIED DUE PROCESS AND A FAIR TRIAL BY REFUSAL TO GRANT A MISTRIAL AFTER INTRODUCTION OF IMPERMISSIBLE CHARACTER EVIDENCE AND OTHER BAD ACTS.

IV.      PETITIONER WAS DENIED DUE PROCESS WHERE HE WAS PREJUDICED BY INTRODUCTION OF TESTIMONY AND ARGUMENT THAT HE WAS IN A GANG AND THAT HE HAD THREATENED WITNESSES.

V.      PETITIONER'S STATEMENT TO POLICE WAS INVOLUNTARY AND INADMISSIBLE.

VI.      THE COURT IMPROPERLY ADMITTED THE OUT-OF-COURT STATEMENTS OF CODEFENDANT WANDA RATLIFF AGAINST PETITIONER GOVER, VIOLATING DUE PROCESS AND THE RIGHT OF CONFRONTATION.

VII.      PETITIONER DENIED A FAIR TRIAL WHERE THE TRIAL COURT AND PROSECUTOR DENIGRATED DEFENSE COUNSEL.

VIII.      PETITIONER WAS PREJUDICED BY THE CUMULATIVE EFFECT OF THE PROSECUTOR'S MISCONDUCT.

IX.      THE TRIAL COURT DENIED PETITIONER A FAIR TRIAL BY REFUSING TO INSTRUCT THE JURY ON MANSLAUGHTER, AND RECKLESS DISCHARGE OF A FIREARM.

X.      PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHERE THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE

CHARGE OF FIRST DEGREE MURDER SUBMITTED TO THE JURY.

XI.     PETITIONER DENIED A FAIR TRIAL BY DENIAL OF MOTION FOR
        MISTRIAL, FAILURE OF COUNSEL AND COURT TO PROVIDE
        VOLUNTARY MANSLAUGHTER INSTRUCTIONS IN LIGHT OF THE
        JURY NOTES AND REQUESTS TO THE COURT.

XII.    PETITIONER WAS DENIED THE DUE PROCESS RIGHT TO BE
        SENTENCED BY A NEUTRAL AND DETACHED JUDGE.

XIII.   PETITIONER SHOULD BE RESENTENCED BECAUSE THE
        SENTENCING JUDGE DEPARTED UPWARD FOR FAILURE TO
        ADMIT GUILT AND WHERE THE SENTENCING JUDGE DEPARTED
        UPWARD FOR PETITIONER'S FAILURE TO ADMIT GUILT, DUE
        PROCESS AND EQUAL PROTECTION REQUIRE PETITIONER TO BE
        RESENTENCED.

Petitioner filed an amended application on May 24, 2007, raising an additional claim that counsel

was ineffective for failing to investigate the defense.

7.      Respondent filed his answer on June 1, 2007.  He contends that petitioner's claims

are either procedurally defaulted or without merit.

8.      Petitioner filed a reply to respondent's answer on July 26, 2007.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from a drive-by shooting in Detroit which resulted in the death

of a 9-year-old bystander and the wounding of two others.  The evidence adduced at trial was

accurately summarized in petitioner's appellate brief (grammar and spelling errors as in original):

> Kwesi Brown testified that he was at Wanda Ratliff's house on Lannette
> Street on October 24, 1994. Ms. Ratliff sold Marijuana from that house. (Vol 10-22,
> 21).  Dennis was there, Wanda and Sharon were talking. Defendant objected to
> hearsay statements and his objection was overruled.  (23) Counsel objected several
> times, and maintained a continuing objection to hearsay where there had been no
> showing of a conspiracy. (25-26).  Wanda thought Ricco or Ricky did it.  (27).
> Wanda said she was going to "put a gun to they baby privacy and blow they head
> off." (27).  The prosecutor had Mr. Brown repeat this.  Brown saw a .9 mm and a
> Mack 90 in the house.  (28).  Wanda and Sharon asked Defendant to go over to

Rosemary to get their stuff back. Defendant was on crutches. Wanda and Sharon were in the front seat and Rob Ketchings and Defendant were in the back seat. (32). Wanda had the Mack 90. Ketchings had a .380. The care drove off and Mr. Brown heard shots. They returned a minute later, and Wanda got out and told him, over objection, while Defendant was still in the car, that Ricky laughed at her, she called one of the guys a "B" word, "then next you know one of them was trying to reach for something, next you know there was a lot of shooting happened." (39). Somebody drove up to Wanda's house then and started shooting. The police came and picked up Defendant. Kwesi Brown was arrested for murder I and obstruction of justice. (45). They held him over night and he gave his statement the next day. The police released him, about two hours later. (48).

Antuan Charley went to Wanda's house on Lanette with Defendant and Wanda's common law husband, Charles Coppage. The night before, Wanda had been robbed at gun point. (58). She and Coppage figured it was Ricky who robbed them. Wanda wanted revenge. At some point the witness left and later heard shots. (61).

Rich Taylor testified that he was on the porch at 14817 Rosemary when a car drove up. (69). Two white females were in the front seat and two black males were in the back seat. One of the females asked for Rick. (70). Someone said Rick wasn't there and then Taylor heard shots. He didn't really see who did the shooting. Taylor picked Defendant from a line-up. (73). The witness ran when the shots started. Dushawn was shot in the back and Leon was shot in the foot. (77). Taylor did not see the shooter's face. He picked Dennis Gover because Gover appeared to be frightened in the line-up. (83).

Officer Anthony Johnson responded to the Rosemary shooting and heard shots on Lanette Street. (86-87). There were two white females exiting an automobile, whom the officer arrested. Over objection, the officer testified that one of the females, Wanda, after being advised of her rights, told him that the two black males in the car began firing shots out of the window on Rosemary Street. (89). After Wanda was arrested, Defendant and another man voiced their disapproval that the police did not arrest Ricky (90), who had robbed Wanda. Defendant was wearing a plaid shirt and was on crutches. (93).

Dushawn Salter testified that he was at the house on Rosemary when two ladies pulled up in a car. There were two black males in the back seat, one of them wearing a hood (100). One of the ladies said something and then he heard shots. Kids were screaming and Salter was shot in the back. (102).

Latoya Warfield was at 14903 Rosemary when the car came down the street. She saw two black people in the back seat. They started shooting (113) from both sides of the car (116). Her sister Michelle started breathing funny. By the time the ambulance arrived, she had stopped breathing. (119).

Leon Kennedy testified that he was outside on Rosemary Street when the car drove up and the white lady asked for Rick. A 9 mm came out of the back seat and started shooting. Kennedy was shot in the foot. He did not see the faces of the people in the back seat. (132). He said in his statement that the shots came from the

left side of the car. (134).

Donika Warfield testified that she saw the car, and someone came out the driver's side back window, shooting over the head of the car. (139-141). She got the kids in the house, but Michelle stopped breathing, although there were no bullet holes evident. (144). She told the police there were three or four guys in the back seat. (146).

Yolanda Warfield had to identify her daughter's body. (156).

Officer King responded to Rosemary, heard more shots, then went to Lanette Street where he detained two females. Sharon said she wasn't going down for something she didn't do. Defendant was angry about their arrest.

Officer Collinash took photographs and prints from the car. (170).

Alfred Sherrod was at Wanda's house and he also testified to the statements by Wanda prior to the shooting. (Vol 10-23, 34). Defendant was wearing a blue sweatshirt that day. (44). Sherrod was in the basement for 10 or 15 minutes, when he came out Wanda said they thought it was funny (47), and soon after that someone started shooting at Wanda's house.

Roger Lee testified that he was present at Wanda's house and Defendant said he wanted to get his stuff back. Lee testified that Defendant had one mode of character, "cool and collected." The prosecutor and the witness repeated this several times, that Defendant was cursing and that he was cool and collected, that his character was cool and collected. (60). Lee did not see Wanda and the others leave, but when they came back, Defendant allegedly said he "busted a cap at them." (65). Wanda was in the marijuana selling business by herself. (68). At the preliminary examination, Lee testified that he did not hear Defendant make any statements. (70).

The medical examiner testified that Michelle Warfield died of a gunshot wound which went through her aorta. (100).

Ike Pennington testified and claimed that he was on Rosemary when Defendant shot a black pistol out of the car. (109). At the preliminary examination he said he believed it was Dennis. (125). He had never seen Mr. Gover before. (135). He told the police that the shooter was wearing a green and white shirt. The other man in the car was wearing a hood. He did not seek that person's face. (114).

Investigator Clark testified to Defendant's statement, where he allegedly said that Wanda wanted him and Rob to go around the corner to get Rick, bring him back and scare him. Wanda had a 9 mm and he had an AK-47 and Rob had a 380. When Wanda asked for Ricky, one of the guys started smirking. Wanda started shooting, then Rob fired two shots. Defendant did not shoot. (148). The officer did not tape record the statement. (160).

Officer Jamison obtained a description of the shooter as male, 18, black, medium complected, wearing a green plaid flannel shirt. (179). 9 mm shell casings, and a 380 casing and a 380 slug were found at the scene. (186).

Ike Pennington's home was searched and guns were seized, including a Mach 11 handgun which would shoot 9 mm rounds. (Vol 10-24, 29).

LaQuitta Davis testified that she was at Wanda's house. Wanda wanted to talk to Ricky because she said he robbed her. (53). Wanda and Sharon, Rob and

Defendant left and were gone for 5 minutes. When they returned, Davis claimed that Defendant had a pistol in his hand that was smoking. (57). However, that type of gun would not emit smoke like that.

Charles Coppage testified that he was living with Wanda Ratliff at the time in question. Marijuana was being sold from the house. (10-30-96, 8). There was a robbery at their house on October 29, 1994, and some guns were stolen. Defendant came over the next day and indicated that "Ricky" was involved in the robbery. Defendant, Wanda, Rob, and Sharon left in the Plymouth Horizon. (13). When they returned, Defendant had a nine millimeter which Coppage alleged was "smoking." (16). Coppage claimed that Defendant said, "I hope I killed one of those mother fuckers" and that he fired at a group of guys. (16). Coppage did not tell the police about the statement allegedly made by Defendant, and he testified at the preliminary examination that he did not see Defendant and the others leave and that he did not see any weapons. (22). Mr. Coppage claimed that some unidentified people threatened him at the exam. (23). Mr. Coppage was arrested. (21).

Ursala Griggs testified that she was at 14817 Rosemary at the time of the shooting. Someone knocked on the door and asked for a guy named Rick. She saw the shooting as she ran to the living room to get her son. There were two black males in the front seat of a small Omni or Horizon. (Vol 10-31, 16-18). A man was standing near the house, shooting at the car. (19). Ike Pennington was not there at the time. The police did not ask to talk to her when they came to the scene. Defendant Gover was not the man who did the shooting from the car. (20).

Defendant Dennis Gover testified that he went to the house on Lynette to work on his car in the driveway. (54). He was suffering from torn ligaments in his ankle and was using crutches. Sharon and Wanda were at the house, talking about the robbery the day before. At some point, the two women, Charles Coppage and Rob Ketchings left the house. Wanda and Sharon were in the front and Charles and Robert were in the back. While they were gone, Defendant heard shots. (58). Defendant did not ever say, "we're coming shooting" or "I hope I killed the mother fuckers." About a minute and a half after they returned, some guys came between the house across the street and started firing at Wanda's house. (59). When the police came, Defendant was upset because they were not concerned about the shooting which occurred at Wanda's house. (61). He was arrested and kept up for 12 hours, handcuffed to a chair, being interrogated. (63). The first part of his written statement was accurate, but the rest was inaccurate. Mr. Gover only signed the statement because he was in severe pain and needed his medication, and because the detective told him if he signed the statement, as long as he didn't do the shooting, he would be released. (65). Defendant asked the police to perform a parafin test on his hands to determine whether he had fired a gun, but they would not. They also refused to put him in a line-up. (66). Defendant had no reason to shoot at the people on Rosemary.

Defendant's request for instructions on the lesser offenses of manslaughter and reckless use of a firearm were denied. (Vol 11-1, 7).

Sergeant Garrison and Sergeant Powell were called to rebut Defendant's

testimony that he requested a parafin test.  Defendant made an oral statement to Garrison which lasted about forty-five minutes, but this statement, which was exculpatory, was not recorded, and the officer did not even take notes.  (58-59).

The jury declared itself hung several times, indicating that all but one juror believed that either Defendant did not intend to kill or did so in the heat of passion, and, after being ordered to continue deliberating, the jury came back with a verdict of second degree murder.

Def.-Appellant's Br. on Appeal, in *People v. Gover*, No. 203768 (Mich. Ct. App.), at 1-7.

C.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

12

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme

Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Denial of Continuance (Claim II)*

        In his second claim, petitioner contends that he was denied a fair trial by the trial court's failure to grant a continuance. Prior to trial, petitioner's retained counsel was allowed to withdraw, and substitute counsel was appointed for petitioner.[1] Two months later, on the day scheduled for trial, counsel sought a continuance to obtain and review transcripts of the trials of petitioner's codefendants and of an evidentiary hearing in petitioner's case. The trial court denied the motion. The Michigan Court of Appeals rejected petitioner's claim, reasoning that the trial court did not abuse its discretion in being suspicious of petitioner's sincerity. The court explained that petitioner's "lack of diligence in obtaining the transcripts and his failure to demonstrate any prejudice as a result of the denial of his motion preclude further consideration of this claim." *Gover*, 1999 WL 33437846, at *13, slip op. at 14. The Court should conclude that this determination was reasonable.

        1.      *Clearly Established Law*

---

        [1]The withdrawal of petitioner's retained counsel is the subject of petitioner's first habeas claim, and is addressed along with petitioner's ineffective assistance of counsel claims in part L, *infra*.

Although the Supreme Court has not more specifically set forth governing standards to determine when a failure to grant a continuance will constitute a denial of the right to present a meaningful defense, the Court has noted that the grant or denial of a motion for a continuance is within the sound discretion of the trial judge, and will be reviewed only for an abuse of that discretion. *See Avery v. Alabama*, 308 U.S. 444, 446 (1940). The Court has also explained that "[i]t would take an extreme case to make the action of the trial court in such a case a denial of due process of law." *Franklin v. South Carolina*, 218 U.S. 161, 168 (1910). "The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). At the same time, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Id.* In short, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Unger*, 376 U.S. at 589). Importantly, denial of a continuance amounts to a due process violation warranting habeas relief only where the petitioner shows that he was prejudiced by the omission of the evidence he would have procured had the continuance been granted. *See Mackey v. Dutton*, 217 F.3d 399, 408 (6th Cir. 2000); *cf. United States v. Allen*, 247 U.S. 741, 771 (8th Cir. 2001) (applying same standard in case on direct review); *United States v. Hall*, 200 F.3d 962, 964 (6th Cir. 2000) (same).

    2.    *Analysis*

At the outset, petitioner contends that the Michigan Court of Appeals's rejection of his claim

15

based on his failure to demonstrate any prejudice is contrary to the Supreme Court's decision in *Britt v. North Carolina*, 404 U.S. 226 (1971). In *Britt*, the indigent defendant had been denied access to a transcript of his previous trial because he could not pay for it. The *Britt* Court determined that, because such a transcript would have been available to a defendant who could afford to pay for it, the denial of the transcript constituted an equal protection violation. Specifically, the Court held that "the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt*, 404 U.S. at 227. Further, the Court explained that the indigent defendant did not need to make a specific showing of need or prejudice tailored to the specific facts of his case. *See id.* at 228. Petitioner contends that this later rule renders the Michigan Court of Appeals's decision contrary to clearly established federal law, because the court of appeals rejected his claim in part based on his failure to establish prejudice. The Court should disagree.

Contrary to petitioner's argument, *Britt* is inapposite and does not provide clearly established law governing petitioner's claim. As explained above, *Britt* involved a state's denial of access to a transcript for an indigent defendant. Here, petitioner does not claim that he was denied access to a transcript at all. That is, he does not contend that he lacked the means to obtain a transcript or that the state did not make one available upon his proper request. Rather, he contends that he should have been granted a continuance so that he could obtain a presumably otherwise available transcript. In these circumstances, the normal denial-of-continuance standard of review, rather than *Britt*, is applicable. *See United States v. Hagen*, No. 86-1465, 1987 WL 38777, at *3 (6th Cir. Oct. 23, 1987) applying abuse of discretion standard to trial court's denial of continuance to obtain transcript, explaining that "we note that had the district court denied the transcript, our

16

review would have been very different indeed. See 18 U.S.C. § 3006A(e); *see also Britt v. North Carolina*, 404 U.S. 226, 230 (1971). However, the district court did not refuse to authorize the transcript, but rather refused to grant a continuance of sufficient duration to have it prepared."); *see also*, *United States v. Zamora-Hernandez*, 222 F.3d 1046, 1049 (9th Cir. 2000) (defendant not denied due process by failure of trial court to grant continuance so that he could obtain transcript where he did not show any prejudice). And, as explained above, to be entitled to habeas relief, petitioner must show actual prejudice to his defense resulting from the trial court's failure to grant a continuance. *See United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997); *Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997).

Here, petitioner has offered no argument that he was prejudiced in any way by the absence of a transcript of his codefendants' trials or the evidentiary hearing in his case. He does not point to any specific impeachment information which the prior transcripts would have furnished, nor any other information helpful to the defense that the transcripts would have revealed. Thus, he has failed to establish actual prejudice to his defense resulting from the trial court's failure to grant a continuance and he cannot show that he was denied a fair trial by the denial of a continuance. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Evidentiary Claims (Claims III & IV)*

Petitioner next raises several evidentiary claims. In his third claim, petitioner argues that he was denied a fair trial by the introduction of impermissible character evidence and evidence of other bad acts. In Claim IV, he argues that he was denied a fair trial by the introduction of evidence that he was in a gang and had threatened a witness.

1.      *Clearly Established Law*

17

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and

18

the adversary system will not be competent to uncover, recognize, and take due account of its

shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

      2.     *Analysis*

      Petitioner contends that he was denied a fair trial by the introduction of evidence that he had

a "cool and collected" character.  During direct examination, the prosecutor questioned witness

Roger Lee regarding a conversation in which petitioner stated he was going to "get his stuff back."

The following exchange occurred:

> Q:     When he was speaking saying he was going, he wanted to go get his stuff
>         back and he was using profanity, what was his tone of voice?
> A:     Ms. Lindsey, Dennis has always, to my knowledge, had one mode of
>         character, and that's cool and collected, as far as I'm concerned.
> Q:     Okay.  He was cool and collected.
> A:     Cool and collective [sic].  One mode of character.
> Q:     One mode of character.  And when he was cursing and saying, "I'm going to
>         go get my stuff back", he was cool and collective [sic].
> A:     Cool and collective [sic].  One mode of character.

Trial Tr., dated 10/23/96, at 46.  Petitioner contends that this character evidence was inadmissible

under Rule 404(a) and that its introduction deprived him of a fair trial.  The Court should disagree.

      First, it is not clear that Lee's testimony constituted impermissible character evidence.  The

prosecutor did not ask Lee what petitioner's character was, but rather his demeanor at a specific

point in time.  Lee responded that he was cool and collected at that time, adding that this was

consistent with his general character.  Thus, while Lee did mention petitioner's general character,

the prosecutor's question and Lee's response were directed toward petitioner's demeanor when he

was talking about getting his stuff back.  Further, Rule 404(a) prohibits introduction of a person's

character or trait of character "for the purpose of proving action in conformity therewith on a

particular occasion."  MICH. R. EVID. 404(a).  Lee's testimony was not used to show any action on

the part of petitioner, but to show petitioner's demeanor.  In any event, petitioner cannot show that the introduction of this evidence deprived him of a fair trial.  As explained in part J, *infra*, there was overwhelming evidence of petitioner's guilt, and Lee's testimony regarding petitioner's "cool and collected" character did not go to whether petitioner had actually committed the crime, but only to his general demeanor.  In these circumstances, petitioner cannot show that he was denied a fair trial by the introduction of this evidence.

Petitioner also contends that he was denied a fair trial by the introduction of other acts evidence, specifically evidence of threats made against various witnesses.  Ike Pennington testified that someone had come to talk to him about the case, that two other witnesses had talked to him after they had testified and indicated that they were concerned because the gang petitioner "used to ride with" knew where they lived, and that he had previously expressed concern about testifying.  *See* Trial Tr., dated 10/23/96, at 91-93.  Laquitta Davis testified that as she entered the courtroom to testify, petitioner looked at her and shook his head, which she took as threatening.  She also testified that petitioner's sister called her at home, and that the substance of the sister's comments caused her to be frightened.  *See* Trial Tr., dated 10/24/96, at 41-46.  Charles Coppage testified that, during the preliminary examination, he and his family had been threatened outside the courtroom.  *See* Trial Tr., dated 10/30/96, at 13-14.  The prosecutor argued during closing argument that the jury's assessment of the consistency and credibility of various witnesses should take into account these threats.  *See* Trial Tr., dated 11/5/96, at 17-19.  Petitioner contends that this evidence and argument denied him a fair trial.  The Court should disagree.

As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction

of this evidence.  This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b).  Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial.  *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974).  Here, the Michigan Court of Appeals determined that the evidence was relevant and "advanced for the proper purpose of explaining hesitation to testify and discrepancies between certain witnesses' testimony and what they had indicated previously; discrepancies motivated by fear of reprisal."  *Gover*, 1999 WL 33437846, at *6 n.3, slip op. at 7 n.3.  This determination was reasonable.  It is well-established that evidence of threats, even if not made by the defendant, are admissible to explain a witness's demeanor or inconsistent testimony.  *See, e.g.*, *United States v. Thadsamany*, 305 Fed. Appx. 942, 944 (4th Cir. 2009); *United States v. Doddles*, 539 F.3d 1291, 1296 (10th Cir. 2008); *People v. Clark*, 124 Mich. App. 410, 412, 335 N.W.2d 53, 54 (1983).[2]  Because the threat evidence was admitted for the proper purpose of explaining the reluctance of the prosecution's witnesses and inconsistencies in their testimonies, petitioner is not entitled to habeas relief on this claim.

F.      *Involuntary Confession (Claim V)*

        Petitioner next contends that he was denied a fair trial by the introduction of his statement

---

[2]Where threat evidence is introduced to show a defendant's consciousness of guilt, the threat must have come from defendant or someone acting at his direction.  *See United States v. Gatto*, 995 F.2d 449, 455 (3d Cir. 1993).  However where, as here, the evidence is introduced to explain a witness's demeanor or inconsistent testimony, "it [is] unnecessary for the prosecutor to convince the jury of a connection between [the person making the threat] and the defendant[]."  *Id.*  *See generally*, *United States v. Thomas*, 86 F.3d 647, 653-54 (7th Cir. 1996).

to the police, which he contends was involuntary. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

      1.    *Clearly Established Law*

As the Supreme Court explained in *Jackson v. Denno*, 378 U.S. 368 (1964), "a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession." *Jackson*, 378 U.S. at 376. "Determining whether a confession is 'voluntary' for due process purposes entails an examination into the 'totality of the circumstances' to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice or by unacceptable tactics that extract their results from an overborne will. The critical line of distinction is between 'self-direction' and 'compulsion.'" *Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *accord Dickerson v. United States*, 530 U.S. 428, 434 (2000). It is not enough that a defendant's will was "overborne" by some factor for which state officials are not responsible. "Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the defendant must establish a causal link between the coercive conduct and the confession." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). There is no bright line test for determining whether a confession is voluntary, nor is any one factor dispositive. Rather, a court must "look[] to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case. Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishments, such as the deprivation of food or

22

sleep." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation and citation omitted); *accord*, *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

For purposes of habeas review, "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a [legal] matter for independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). However, a state court's findings of historical fact are presumed by this Court to be correct unless rebutted by petitioner with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). *See generally*, *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963) (factual findings entitled to a presumption of correctness under the habeas statutes are those relating to "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators.") (internal quotation omitted). Thus, "subsidiary factual questions, such as whether . . . in fact the police engaged in the intimidation tactics alleged by the defendant are entitled to the § 2254[(e)(1)] presumption." *Miller*, 474 U.S. at 112; *see also*, *id*. at 117.

2.    *Analysis*

Petitioner contends that his statement was involuntary based on a number of circumstances which, taken together, overbore his will. Specifically, petitioner claims that "[t]he uncontradicted testimony was that Petitioner was arrested shortly after returning from Detroit Receiving Hospital for a disabling ankle injury, was interrogated throughout the night while handcuffed to a chair without food or drink, and did not begin to confess to anything until after being in custody for nearly 24 hours without any contact with family or a lawyer." Br. in Supp. of Pet., at 34. There was some evidence presented at the evidentiary hearing that supports these assertions. For example, petitioner

23

testified that he asked one of the officers to call his dad to get his pain medication. However, petitioner never testified that his confession was involuntary or his will overborne based on any of the factors now set forth in his brief. Petitioner did not testify that he was in severe pain, or that such pain caused him to confess. Although petitioner testified that he had requested his medication, petitioner's need for the medication was not "uncontradicted" as now asserted. On the contrary, on cross-examination petitioner admitted that he had not filled the prescription for the medicine, had not taken the medicine at all prior to his arrest, and did not have it on him. *See* Evid. Hr'g Tr., dated 7/30/96, at 37. Petitioner did not testify that he requested food, drink, or sleep, and was denied any of these by the police. Indeed, petitioner did not mention food, drink, or sleep at all in his testimony. Rather, petitioner's sole claim of coercion at the evidentiary hearing was that Investigator Clark had promised him that if he gave the statement prepared by Clark he would be released, and would only be considered a witness.

In short, apart from the alleged promise by Investigator Clark, there was no evidence or argument that any other factor contributed to petitioner's will being overborne by coercive police tactics, as petitioner's own testimony at the hearing demonstrates. During cross-examination of petitioner, the following exchange occurred:

> Q:   Okay. And she [a subsequent officer] tried to get you [to] sign another statement saying that you did the shooting?
> A:   Yes, ma'am.
> Q:   And you refused to sign that statement, is that correct?
> A:   Yes, ma'am.
> Q:   Because you were exercising your free will and choice, correct?
> A:   Well, yes.
> Q:   They didn't force you to sign anything you didn't want to sign, is that correct?
> A:   They didn't force me. But he –
> Q:   Sir, the question was on the floor to you, they didn't force you to sign anything you didn't want to sign, correct?

A:      No.
Q:      You voluntarily signed what you wanted to sign.  And when you didn't want
        to sign something you didn't sign it, correct?
A:      Yes.

*Id*. at 41-42.  Petitioner's counsel then asked petitioner a single question on redirect: "Why did you

give Investigator Clark the statement that's at issue in front of the Court?"  Petitioner responded:

"He told me he was going to cut me loose."  *Id*. at 42.  The parties then argued the matter solely

based on the alleged promise made by Investigator Clark.  Specifically, defense counsel listed a

number of things which were not the issue, and then stated: "The issue is a fairly simple one.  The

issue is whether or not Mr. Gover's statement, the one that's before the Court not the unwritten one

from Sgt. Garrison or whatever this third one was from whoever the Homicide officer who

approached him with it.  The issue is whether that statement was given to Investigator Clark as a

result of some kind of a promise that he had not [sic] business making."  *Id*. at 44.  Counsel

continued with his argument, not once suggesting that any fact other than Clark's promise rendered

the statement involuntary:

> The question for the Court to decide is what occurred between that giving of
> the exculpatory statement [to Sgt. Garrison] and the later statement that's given
> about three and half or four hours later to Investigator Clark?  Was it, as the
> prosecution will argue and has kind of argued by implication.  Was it that Mr. Gover
> sat there and decided, 'Well maybe I'd better tell something more.  Maybe I should
> confess my involvement at least as far as I'm willing to admit it.'  Was that what was
> going on with Mr. Gover?  Or in fact was it as Mr. Gover contended?
> Was it because he was promised something in return for giving a, we know
> to be an inculpatory statement?  But that he, despite his vast experience with the
> justice system, at age seventeen might not have realized was an inculpatory
> statement.
> And I guess that's really something only the Court can decide because the
> Court's heard the two witnesses, Investigator Clark and Mr. Gover.

*Id*. at 46.  Counsel again reiterated the basis of petitioner's challenge, stating "it's not a question of

whether he signed the rights form voluntarily and freely and it's not a question of whether he

25

understood those rights.  The law does not allow the police to obtain statements by subterfuge.  And that's what we're contending it is.  And that's what Mr. Gover's testimony is contending." *Id*. at 47.  Without contradiction or objection from defense counsel, the trial judge likewise indicated her understanding that this alone was the basis of petitioner's challenge to the statement: "I have narrowed this question down as to whether, as the defendant says, Investigator Clark's alleged words, IF HE SIGNED THE STATEMENT, HE WOULD CUT HIM LOOSE, was enough to cause the defendant to make a statement?  I have narrowed it down to that." *Id*. at 48.  Petitioner's appellate brief also focused on this aspect of his interrogation. *See* Def.-Appellant's Br. on Appeal, in *People v. Gover*, No. 203768 (Mich. Ct. App.), at 34-35.

In these circumstances, apart from Investigator Clark's alleged promise there is no evidence that petitioner's will was overborne by coercive police conduct, "a necessary prerequisite to the conclusion that a confession was involuntary." *Carter*, 131 F.3d at 462 (citing *Connelly*, 479 U.S. at 163-67).  Although petitioner was 17 years old at the time, he had had prior experience with the criminal justice system, and there was no evidence presented that his statement was the product of "youthful ignorance or the naivete born of inexperience." *Watson v. DeTella*, 121 F.3d 450, 456 (7th Cir. 1997) (internal quotation omitted).  Nor was there any evidence presented that "his free will was overcome by either exhaustion or hunger." *Id*.  Thus the only question here, as in the state courts,
is whether Investigator Clark's alleged promise of leniency to petitioner rendered petitioner's confession involuntary.

With respect to Investigator Clark's promise, petitioner testified that Clark "told me, he pretty much, he told me little details about the case.  They supposedly had witnesses and things, but

not against me at that time.  He assured me to sign the statement saying I went with them and I didn't do no shooting, he was going to cut me loose." Evid. Hr.'g Tr., dated 7/30/96, at 30.  The trial court rejected petitioner's claim both factually and legally.  Factually, the trial court found that petitioner's version of events did not comport with the evidence.  The court reasoned:

> And then the defendant testifies that Investigator Clark, he doesn't say that he raised his voice at him.  He doesn't say that he made any threats against him or made any promises other than this, if he signed this statement, really just exculpatory statement, saying that he was with the other people, that Investigator Clark would cut him loose.  That doesn't make any sense.
> It really doesn't make any sense with Officer Clark and Investigator Garrison [sic] armed with all the information that they claimed they had regarding the shooting, and the people involved.

*Id*. at 49.  Legally, the trial court found that even if Investigator Clark made the statement attributed to him by petitioner, "the prosecutor has carried its burden by a preponderance of the evidence that this statement was knowing and voluntarily made without any improper action on the part of the officers.  Especially in light of the fact that the officers kept giving him his rights and kept getting him to initial his rights.  He was definitely a suspect.  And they were treating him like he was a suspect because they kept making sure that he knew what his rights were."  *Id*. at 50.  The court of appeals, addressing only the legal aspect of this ruling, held that the statement was voluntary because, "[u]nder the totality of the circumstances, defendant was not likely to have reasonably understood the investigator's comment as a promise of leniency or to have relied on the comment in making his confession."  *Gover*, 1999 WL 33437846, at *7, slip op. at 8.

The trial court's conclusion that petitioner's version did not make sense was, in essence, a factual finding rejecting petitioner's claim that Investigator Clark had promised to "cut him loose" if he signed the statement.  As noted above, such a factual finding is presumed correct unless rebutted by clear and convincing evidence.  Petitioner has failed to offer any clear and convincing

27

evidence to rebut the trial court's factual finding, and thus petitioner cannot show either that the state courts' resolution of this claim was unreasonable application of clearly established law under § 2254(d)(1), or that it was based on an unreasonable determination of the facts under § 2254(d)(2).

Even assuming, however, that the trial court's rejection of petitioner's claim does not constitute a factual finding to which the Court must defer, petitioner cannot show that the Michigan Court of Appeals's rejection of his claim was unreasonable under § 2254(d)(1). Promises of leniency or non-prosecution do not *per se* render a confession involuntary. *See United States v. Flemmi*, 225 F.3d 78, 91 (1st Cir. 2000); *United States v. Larry*, 126 F.3d 1077, 1079 (8th Cir. 1997). The question is whether the promise overbore the defendant's free will and induced his statement. *See United States v. Prince*, 157 F. Supp. 2d 316, 329 (D. Del. 2001). Here, Clark's alleged statement did not constitute a promise of leniency or non-prosecution. A promise to "cut loose" petitioner at that time is far from a promise that petitioner would not be prosecuted, particularly in light of the fact that the promise to cut petitioner loose was premised on the understanding that petitioner did not fire any shots, when in fact the evidence later suggested that petitioner had fired shots. Regardless of how this Court would view the matter as an independent matter, it cannot be said that the Michigan Court of Appeals's determination that petitioner "was not likely to have reasonably understood the investigator's comment as a promise of leniency or to have relied on the comment in making his confession" was unreasonable in light of the evidence presented at the evidentiary hearing. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.    *Confrontation (Claim VI)*

In his sixth claim, petitioner contends that he was denied his right to confront the witnesses

against him in two respects.  First, he contends that he was denied his right to confront the witnesses by the introduction of hearsay statements.  Second, he contends that he was denied his confrontation right by the trial court's limitation on his cross-examination.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

      1.    *Hearsay Evidence*

Petitioner next contends that he was denied his right to confront the witnesses against him by the introduction of various hearsay statements.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a.  Clearly Established Law

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause.  *See Pointer v. Texas*, 480 U.S. 400, 406 (1965).  At the time of petitioner's trial and appeal of right, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980).  In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings.  Thus, the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability."  Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66.  As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception.  The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability."  *Idaho v. Wright*, 497 U.S. 805, 821 (1990).  Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection."  *Roberts*, 448 U.S. at 66 (internal quotation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements.  After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  *Crawford*, 541 U.S. at 59.  The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause.  *See id*. at 60-68.  The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."  *Id*. at 68-69.  In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'"  *Crawford*, 541 U.S. at 68.  The Court did, however, provide some guidance.  Specifically, the Court provided three possible "formulations of

30

th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52 (internal quotations and citations omitted).  While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Crawford*, 541 U.S. at 68.

Crawford establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay.  The question therefore remains whether *Roberts* has any applicability to this case to the extent that the statements admitted at petitioner's trial were not testimonial hearsay under *Crawford*.  Because it is now clear that the Confrontation Clause is not at all concerned with non-testimonial hearsay, the Court should conclude that *Roberts* has no application here.

In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the admission at trial of non-testimonial hearsay.  The Court explained that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether."  *Crawford*, 541 U.S. at 68. Immediately following *Crawford*, the Courts concluded that *Roberts* remained applicable to non-

31

testimonial hearsay, observing:

> [t]he lynchpin of the *Crawford* decision thus is its distinction  between testimonial and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements. . . . [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005); *see also*, *Horton v. Allen*, 370 F.3d 75, 83-84 (1st Cir. 2004); *United States v. Johnson*, 354 F. Supp. 2d 939, 964 (N.D. Iowa 2005); *United States v. Savoca*, 335 F. Supp. 2d 385, 391-92 (S.D.N.Y. 2004).  Regardless of whether this reading of the *Crawford* dictum was correct, the Supreme Court has since clarified that the Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay.  In *Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether the Confrontation Clause applies only to testimonial hearsay," *id*. at 823, and in doing so abrogated *Roberts* in whole.  The Court noted that the answer to this question was suggested in *Crawford*, when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who give "testimony."  *Id*. at 823-24 (discussing *Crawford*, 541 U.S. at 51).  The *Davis* Court explained that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter."  *Id*. at 824  Thus, where nontestimonial hearsay is at issue, the Confrontation Clause is not implicated at all, and need not be considered.  *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability.  Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

32

This conclusion is not altered by the fact that *Roberts* was clearly established federal law at the time the Michigan Court of Appeals decided petitioner's case.  The jurisdiction of a federal court to issue a writ of habeas corpus is provided by § 2254(a), which grants jurisdiction to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Section 2254(d) merely delineates a subset of these cases in which habeas relief is not available.  Thus, a finding under § 2254(d)(1) that the state court unreasonably applied *Roberts* would not automatically entitle petitioner to habeas relief if the admission of the evidence were nonetheless constitutional.  As the Fourth Circuit has explained,

> [n]either *Williams* nor § 2254(d)(1) requires issuance of a writ before determining the critical question of whether a prisoner is being held in violation of the Constitution or laws of the United States. Thus, the proper interpretation of the role of § 2254(d)(1) in habeas corpus review is that it establishes a threshold by which we determine whether we are authorized to issue a writ, but it does not compel the issuance of a writ once the standard set forth therein has been satisfied. *See [Williams*, 529 U.S.] at 412 (deeming § 2254(d)(1) a "new constraint" on federal courts' power to issue writs and stating that a federal court "may" issue the writ upon determining that the standards found in § 2254(d)(1) are satisfied); *see also Weeks v. Angelone*, 528 U.S. 225, 237 (2000) (referring to the issue under § 2254(d)(1) as whether habeas relief is "preclude[d]" or "prohibit[ed]," rather than whether such relief is mandated). Rather, § 2254(d)(1) must be read in conjunction with the purpose of the writ, as outlined in § 2254(a), which is to protect a prisoner from being held in violation of federal law.

*Rose v. Lee*, 252 F.3d 676, 691 (4th Cir. 2001) (parallel citations omitted).  In other words, even where a state court decision is unreasonable under § 2254(d)(1), "a prisoner must establish an entitlement to the relief he seeks" under § 2254(a) by demonstrating that he is being held in violation of the Constitution or laws of the United States.  *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003); *see also*, *Palmer v. Clark*, 408 F.3d 423, 436 (8th Cir. 2005) ("Even if the [state] court erred in its analysis, [petitioner] is not entitled to relief on this ground unless his constitutional or statutory

33

rights were violated."). Thus, if the hearsay evidence admitted at petitioner's trial was not testimonial under *Crawford*, then petitioner cannot establish a constitutional violation under § 2254(a) and he is not entitled to habeas relief, regardless of whether the admission of the evidence comported with *Roberts*.[3]

Thus, to be entitled to relief on this claim, petitioner must make two showings. First, he must show that the hearsay at issue is testimonial under *Crawford* and thus that its introduction establishes a constitutional violation under § 2254(a). If he makes this showing, he must also show that the Michigan Court of Appeals's rejection of his claim was an unreasonable application of *Roberts*–the clearly established federal law at the time of the court of appeals's decision–under § 2254(d).

### b. Analysis

Petitioner identifies a number of hearsay statements introduced at trial the introduction of which he contends violated his right to confront the witnesses. For purposes of analysis, these statements can be grouped into four categories: (1) testimony of witnesses regarding statements made by codefendant Wanda Ratliff prior to the shooting describing the robbery of her by "Ricky" and her desire for revenge, and statements made after the shooting describing the shooting, *see, e.g.*, Trial Tr., dated 10/22/96, at 19-21, 30, 46-47; *id.*, dated 10/23/96, at 30-31; (2) witness Kwesi-Ana Brown's testimony regarding his arrest at the courthouse based on Ratliff's statements to the police that he had threatened Ratliff, *see id.*, dated 10/22/96, at 38-39; (3) police officer testimony

---

[3]Although this result flows from a plain reading of § 2254, the conclusion is buttressed by the absurdity of a contrary result. For instance, suppose that the Court were to conclude that the Michigan Court of Appeals unreasonably applied *Roberts* with respect to a particular non-testimonial statement, and that this finding alone entitled petitioner to habeas relief. The actual relief to which petitioner would be entitled would be a new trial. However, at that new trial, the prosecution would be free to again introduce the non-testimonial statement, because under *Crawford* and *Davis* it is clear that the non-testimonial statement is not barred by the Confrontation Clause.

regarding statements made by witnesses to the crime, which described the shots as having come from the two black males in the backseat of the car, *see id.*, dated 10/23/96, at 141-42; and (4) police officer statements made by Ratliff to the police, *see id.*, dated 10/22/96, at 71.

Turning to the first category of hearsay testimony–statements made by Ratliff to others at the home regarding the robbery by "Ricky," her desire for revenge, and the details of the shooting–it is clear that these statements were not testimonial and thus that there was no constitutional violation by their admission. Many of these statements are statements of a coconspirator during and in furtherance of the conspiracy which are defined as non-hearsay under Rule 801(d)(2)(E). The courts, including the Sixth Circuit, have uniformly held that such co-conspirator statements do not constitute testimonial hearsay under *Crawford*. *See United States v. Stover*, 474 F.3d 904, 912-13 (6th Cir. 2007); *see also*, *United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005); *United States v. Sanchez-Berrios*, 424 F.3d 65, 75 (1st Cir. 2005); *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005); *United States v. Logan*, 419 F.3d 172, 178 (2d Cir. 2004); *United States v. Robinson*, 367 F.3d 278, 292 n.20 (5th Cir. 2004); *United States v. Reyes*, 362 F.3d 536, 541 n.4 (8th Cir. 2004). To the extent that the statements are not coconspirator statements, they are still non-testimonial. Statements to friends and acquaintances in a social setting do not constitute testimonial hearsay under *Crawford*. *See Doan v. Carter*, 548 F.3d 449, 458 (6th Cir. 2008) (victim's statements to family and friends regarding abuse she had received at hands of petitioner not testimonial); *United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (citing cases) (casual statements to family and acquaintances nontestimonial under *Crawford*).

The second category of statements–Ratliff's statements to the police at the preliminary examination reporting that witness Brown had threatened her–likewise do not implicate the

35

Confrontation Clause.  These statements were not hearsay because they were not offered to prove the truth of the matter asserted.  *See* MICH. R. EVID. 801(c).  That is, they were not offered to prove that Brown had, in fact, threatened Ratliff.  On the contrary the prosecutor, who presented Brown as a cooperating witness and elicited this testimony from Brown, had no motive to show that Brown had in fact threatened anyone.  Rather, the testimony was elicited in response to defense counsel's cross-examination, which put some focus on Brown's arrest.  *See* Trial Tr., dated 10/22/96, at 36-38.  Thus, the prosecution elicited this statement to show state of mind of the police in arresting Brown, rather than to show that Brown had in fact threatened Ratliff.  Because this hearsay was not offered to prove the truth of the matter asserted and thus was not hearsay under Rule 801(c), its introduction did not violate the Confrontation Clause.  *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)) ("The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.")

The third hearsay category which petitioner challenges concerns the testimony of Officer Michael Jamison, relating information provided to him by witnesses at the scene.  Specifically, Officer Jamison testified that the people he spoke to at the scene immediately after the shooting and while the suspects were still at large–Rosemary Salter, Shawn Salter, and Tiffany Warfield–told him about the shooting, described the car and its occupants, and indicated that the shots came from the two black males in the rear of the vehicle.  *See* Trial Tr., dated 10/23/96, at 138-41.  Officer Jamison testified that he then relayed this information to dispatch for use in apprehending the suspects.  It is questionable whether the information related to Officer Jamison constitutes testimonial hearsay.  In *Davis*, the Court addressed statements made by witnesses to police officers outside the formal, post-crime investigative setting.  Specifically, the Court held that

36

> [s]tatements are nontestimonial when made in the course of police
> interrogation under circumstances objectively indicating that the primary purpose of
> the interrogation is to enable police assistance to meet an ongoing emergency. They
> are testimonial when the circumstances objectively indicate that there is no such
> ongoing emergency, and that the primary purpose of the interrogation is to establish
> or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 822. Here, Officer Jamison's testimony indicates that the statements of the

witnesses were made immediately after the shooting, while the suspects were still at large, and that

the information obtained was relayed to the dispatcher to assist in the apprehension of the suspects.

The primary purpose of the interrogation at that point in time was "to enable police assistance to

meet an ongoing emergency" rather than to "establish or prove past events . . . relevant to later

criminal prosecution." *Id*.; *see also*, *id*. at 827-28.

In any event, even if the statements by the witnesses to Officer Jamison do constitute

testimonial hearsay, petitioner was not deprived of his right to confront the witnesses against him

by the introduction of the hearsay evidence. All of the witnesses present at the time of the shooting

testified at trial. These included Rich Taylor, Dushawn Salter, Latoya Warfield, Leon Kennedy,

Donica Warfield, Yolanda Warfield, and Ike Pennington. Assuming that all of the hearsay

information testified to by Officer Jamison came from these witnesses, and neither the record nor

petitioner suggests that there were any other witnesses who may have made statements to Jamison,

there was no confrontation violation. As the Supreme Court has explained, "where the declarant is

not absent, but is present to testify and to submit to cross examination, our cases, if anything, support

the conclusion that the admission of his out of court statements does not create a confrontation

clause problem." *California v. Green*, 399 U.S. 149, 162 (1970). Thus, "the Confrontation Clause

is not violated by admitting a declarant's out-of-court statements, as long as the declarant is

testifying as a witness and subject to full and effective cross-examination." *Id.* at 158; *see also*,

*Crawford*, 541 U.S. at 59 n.9 ("[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.").

Finally, petitioner points to two hearsay statements made by codefendant Ratliff. Officer Herman King testified that after Ratliff and Sharon Hunter had been placed in the back of the patrol car, Ratliff said to Hunter that she "wasn't going down for something she didn't do." Trial Tr., dated 10/22/96, at 132. This statement is not testimonial hearsay. It was not elicited by or made to the arresting police officers. Rather, it was a spontaneous statement by one suspect to another, and is similar to the statements Ratliff made in her home to acquaintances. For the same reasons as those statements were not testimonial, Ratliff's statement to Hunter is not.

More troubling is the testimony of Officer Anthony Johnson. He testified that after Ratliff and Sharon Hunter had been placed under arrest and advised of their rights, Ratliff indicated that they were driving in the car and the two black males in the back seat began firing. This is quintessentially the type of statement which the Supreme Court identified in *Crawford* and *Davis* as constituting testimonial hearsay. Further, the court of appeals's conclusion that this statement was admissible notwithstanding the confrontation clause because it bore adequate indicia of reliability as a statement against Ratliff's interest, *see Gover*, 1999 WL 33437846, at *9, was an unreasonable application of clearly established federal law. The Supreme Court has twice explained, once just two months before the court of appeals's decision in petitioner's case, that the statement against interest exception is not a "firmly rooted" hearsay exception under the *Roberts* test. *See Lilly v. Virginia*, 527 U.S. 116, 134 (1999); *Lee v. Illinois*, 476 U.S. 530, 544 n.5 (1986). Nor are there

38

any circumstances surrounding the making of the statement which provide particularized guarantees of trustworthiness.[4]   In the absence of such circumstances, "a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." *Lee*, 476 U.S. at 545.

Nevertheless, petitioner is not entitled to habeas relief because the erroneous admission of this single hearsay statement was harmless.  In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court held that trial error does not entitle state prisoners to habeas relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Confrontation Clause violations are subject to harmless error analysis, including violations arising from the introduction of a codefendant's inculpatory statement.  *See Lilly*, 527 U.S. at 139-40; *Lee*, 476 U.S. at 547.  Here, a number of witnesses placed defendant in the backseat of the vehicle and either testified that the shots came from the backseat or specifically identified petitioner as one of the shooters.  *See, e.g.*, Trial Tr., dated 10/22/96, at 32, 73, 100, 116, 132, 139-41; *id.*, dated 10/23/96, at 125.  Further, witnesses testified that petitioner returned to Ratliff's home with a "smoking" gun and indicated that he had "busted a cap" and hoped that he had hit someone.  *See id.*, dated 10/23/96, at 65; *id.*, dated 10/24/96, at 57; *id.*, dated 10/30/96, at 16.  In these circumstances, Ratliff's statement placing petitioner in the back of the car and blaming him for firing the shots was cumulative of extensive other evidence that petitioner was in the back seat of the car and had fired the shots, and thus the

---

[4]Under *Roberts*, whether a hearsay statement bears particularized guarantees of trustworthiness is determined based solely on the facts surrounding the making of the statement; other facts, such as other evidence which corroborates the statement, are irrelevant. *See Idaho v. Wright*, 497 U.S. 805, 819-20 (1990).

admission of this hearsay statement did not have a substantial and injurious effect on the verdict. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his confrontation claims.

2.      *Limits on Cross-Examination*

Petitioner also contends that he was denied his right to confrontation by the trial court's limitations on his cross-examination of various witnesses. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

*a. Clearly Established Law*

The Supreme Court's "Confrontation Clause cases fall into two broad categories: cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (per curiam). The latter category, which is implicated here, recognizes that "[c]onfrontation means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). Thus, in cases where the trial court has restricted cross-examination in some manner, "the Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively . . . emasculate the right of cross-examination itself.'" *Fensterer*, 474 U.S. at 19 (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

However, the Supreme Court has also explained that the Confrontation Clause does not "guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish." *Fensterer*, 474 U.S. at 20. The question is whether the trial court's ruling allowed for "substantial compliance with the purposes behind the confrontation requirement," or, put another way, whether petitioner was "significantly limited in any way in the scope or nature of his cross-

40

examination." *Green*, 399 U.S. at 166.  Thus, "[s]o long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *see also*, *United States v. Larranaga*, 787 F.2d 489, 498 (10th Cir. 1986).

*b. Analysis*

Petitioner points to three instances in which he claims his right to confront the witnesses was restricted.  First, petitioner's counsel elicited from Investigator Clark that petitioner's statement to him had not been recorded.  *See* Trial Tr., dated 10/23/96, at 119, 124.  During recross-examination, counsel asked Investigator Clark whether any police department policy prevented him from recording the statement.  Clark responded: "I don't know.  I can't answer that question."  *Id.* at 126.  The trial court then interjected that police department policies were not on trial, and that counsel would not be able to further pursue this line of inquiry.  *See id.*  Petitioner cannot show that this ruling "significantly limited [him] in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166.  The import of the testimony was whether the statement had or had not been recorded.  The reason for the lack of recording was not significantly relevant.  Further, even though the trial court precluded further inquiry, Clark had already responded to the question by saying that he did not know the answer, and thus any further inquiry likely would have been fruitless.

Petitioner next contends that his cross-examination was improperly restricted when counsel asked, on recross-examination of Laquitta Davis, whether she had given a statement to the police.  The prosecutor objected, arguing that the question exceeded the scope of the prosecutor's redirect examination of the witness.  The trial court agreed, and limited counsel's recross-examination to the

41

matters that had been covered by the prosecutor's redirect examination. *See* Trial Tr., dated 10/24/96, at 83. This ruling did not implicate petitioner's right to confront the witness. There is no general constitutional right to recross-examination; a denial of recross-examination implicates the Confrontation Clause only where it prevents the defendant from exploring new matters raised for the first time on redirect examination. *See United States v. Payne*, 437 F.3d 540, 549-50 (6th Cir. 2006); *United States v. Lopez-Cuevas*, 152 Fed. Appx. 665, 666 (9th Cir. 2005); *United States v. Ross*, 33 F.3d 1507, 1518 (11th Cir. 1994). Petitioner does not contend that he was prohibited from exploring any new matters that had been raised on the prosecutor's redirect examination of Laquitta Davis, and thus he cannot show that his right to confront the witness was violated.

Finally, petitioner contends that the trial court improperly restricted his cross-examination of Sgt. Garrison. On cross-examination, counsel repeatedly elicited from him that he did not write down or record petitioner's exculpatory statement given to Sgt. Garrison. *See* Trial Tr., dated 11/1/96, at 58-62. On recross-examination, counsel attempted to ask Sgt. Garrison why he had not written or recorded the statement. The trial court precluded this line of inquiry, noting that the "bottom line" was that the statement had not been recorded. *See id*. at 62-63. As the prosecutor correctly observed, this question exceeded the scope of the prosecutor's redirect examination, and thus the trial court's limitation on this question did not violate petitioner's confrontation rights. Further, as with the Investigator Clark's testimony regarding petitioner's inculpatory statement, the jury was well informed both that petitioner had made the exculpatory statement to Sgt. Garrison and that the statement had not been recorded. Petitioner has offered no argument as to how the reason for the lack of recording was relevant, or how the exclusion of this testimony "significantly limited [him] in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166.

42

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his confrontation claims.

H.    *Prosecutorial/Judicial Misconduct (Claims VII & VIII)*

Petitioner next contends that he was deprived of a fair trial by several instances of prosecutorial or judicial misconduct. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

Apart from judicial comments which show bias, a judge's comments will provide a ground for habeas relief only if the comments deprived the petitioner of a fair trial. Unlike an appellate

43

court on direct appeal, a federal habeas court does not exercise supervisory powers over the state courts, *see Murphy v. Florida*, 421 U.S. 794, 797 (1975), and thus a federal court's habeas jurisdiction is limited to correcting violations of federal constitutional law; it does not have the authority to correct perceived injustices absent a constitutional violation. *See Guinan v. United States*, 6 F.3d 468, 470-71 (7th Cir. 1993); 28 U.S.C. § 2254(a) (emphasis added) (federal court has jurisdiction to entertain petition brought by state prisoner "*only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").[5]

As the Sixth Circuit has explained:

> Unless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction. In collateral proceedings, the test is whether the errors alleged could have rendered the trial fundamentally unfair. To violate a defendant's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree.

*McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985) (internal quotations, citations, and alterations omitted). Or as the Ninth Circuit has explained, on habeas review "the question is not simply whether the trial judge committed misconduct or whether [a federal appellate court] would reverse a conviction obtained after a trial in which a federal judge behaved in the same manner. Rather, we must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995); *accord Harrington v. Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997). In other words, to warrant habeas relief "there must be an 'extremely high level of interference' by the trial

---

[5]In contrast, a federal court may use its supervisory powers over lower federal courts and federal prosecutors to correct injustices. *See United States v. Leslie*, 783 F.2d 541, 569-70 (5th Cir. 1986) (en banc) (Williams, J., dissenting), *vacated*, 479 U.S. 1074 (1987); *United States v. Crawford*, 466 F.2d 1155, 1157 (10th Cir. 1972).

judge which creates 'a pervasive climate of partiality and unfairness.'" *Duckett*, 67 F.3d at 740

(quoting *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982)).

   2.      *Analysis*

               *a. Denigration of Defense Counsel*

   Petitioner contends that he was denied a fair trial by the repeated denigration of his trial

counsel by both the trial judge and the prosecutor.  Specifically, petitioner points to the following

comments by the prosecutor:

- During cross-examination of Brown, defense counsel asked whether the "charges" against Brown had been dropped after he gave his statement to the police.  The prosecutor objected on the basis that Brown had never been charged, stating "He's a lawyer.  He knows he has to phrase it the correct way."  Trial Tr., dated 10/22/96, at 36.

- During the direct examination of Taylor, defense counsel objected to a question regarding Taylor's identification of petitioner by arguing that any identification was flawed.  The trial court responded that counsel would be allowed to pursue this matter on cross-examination.  The prosecutor then stated: "I'm going to ask for objections to be legal objections and not objections that are argumentative."  The court responded: "Alright, I'll take care of that part."  *Id*. at 58.

- During cross-examination of Investigator Clark, defense counsel asked whether he had taken petitioner to be arraigned.  The prosecutor objected: "Certain things are not required and to use legal terms and to insinuate something was improperly done I think . . ."   The trial court sustained the objection, and told the jury to disregard the question.  *Id*., dated 10/23/96, at 118-19.

- Again during Clark's cross-examination, counsel asked a question that began: "And you said a Lt. Carter, who was Lt. Austin at the time . . ." The prosecutor interposed: "No.  No.  No.  If he's going to impeach, he has to do it correctly," pointing out that the statement being used to impeach indicated that Clark had seen Lt. Carter speaking with his commander, who (the commander, that is), was Lt. Austin.  *Id*. at 122.  Counsel thanked the prosecutor for the correction.  *See id*.

- During the prosecutor's rebuttal argument, the prosecutor responded to

defense counsel's suggestion that the prosecution had only insinuated that threats had been made against the witnesses by stating that for petitioner to be right, everyone would have to be wrong, including the prosecutor: "I've got to be wrong because I'm insinuating threats in this case.  This case has even degenerating him [sic] slandering and slurring my ethics by saying that I'm insinuating there were threats."  *Id.*, dated 11/5/96, at 51.

• Continuing with defense counsel's claim that there was no evidence of threats to the witnesses, the prosecutor pointed to the testimony supporting that claim.  The prosecutor then stated: "I understand you got a job to do to defend  your client, but that don't mean you got to stand up here and start saying stuff that did not happen.  That's not what we're all about.  We're hears about truth, we're here about fairness, and nothing about defendant a client gives you the right to stand up here in front of a jury and lie and misquote the evidence just because you're trying to get the specific goal."  *Id.* at 52.

Petitioner cannot show that he was deprived of a fair trial by the prosecutor's comments.  For the most part, the prosecutor's comments were properly interposed objections to counsel's questioning of the witnesses or fair responses to counsel's objections.  Objecting that counsel's being argumentative or engaging in improper impeachment do not disparage counsel, but raise proper legal arguments for the trial court's resolution.  The only two arguably improper comments were the comments made during rebuttal argument.  However, these comments were properly responsive to defense counsel's closing argument, during which counsel argued: "I use the word bicker because some of this evidence is not there from what she says about the threats.  I mean, that's about the most unfair thing that's been brought out through this whole trial.  There is no evidence of any threats.  There is an insinuation by the prosecution of threats."  Trial Tr., dated 11/5/96, at 34.  The prosecutor's comment that defense counsel had unfairly attacked her integrity was a fair response to this argument.  *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (an important factor in evaluating the permissibility of prosecutorial comments is whether the prosecutor's statements were "invited by or was responsive" to the defense).  Likewise, the

46

comments regarding counsel lying were likewise responsive to counsel's argument, and even if across the line separating proper from improper conduct, were not so egregious as to deny petitioner a fair trial. *See United States v. August*, 984 F.2d 705, 714-15 (6th Cir. 1992) (on direct review of federal conviction, prosecutor's comment that defense counsel was trying to trick the jury did not rise to the level of prosecutorial misconduct, noting that "[a] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for truth." ); *Lindgren v. Lane*, 925 F.2d 198, 204 (7th Cir. 1991) (prosecutor's comments that defense theory was rife with inconsistencies, that defense counsel pulled "these inconsistencies like a magician pulls rabbits out of his hats," and that defense counsel was trying to "trick" the jury with "illusions" were not so egregious as to warrant habeas relief).

With respect to the trial judge's comments, the judge admonished both attorneys at various times in an attempt to keep control of the courtroom. In response to an objection from the prosecutor that counsel's question called for speculation, the court sustained the objection and stated: "Let me say this. If I get the impression that there is an intentional misleading this jury, I'm not going to be real happy about it." Trial Tr., dated 10/22/96, at 50. When counsel began to ask a question speculating that a bullet may have ricocheted, the court interjected: "Well, you can't testify, Mr. Plumpe, now." *Id*. at 86. At one point, the prosecutor objected, and defense counsel continued with his questioning. The court stopped counsel, stating "Wait a minute, Mr., Plumpe. There's an objection on the floor." When counsel continued to argue, the court stated, "Mr. Plumpe, now. There's an objection." Counsel continued to argue, and the court stated, "I have rules, okay? I said there was an objection on the floor." When counsel attempted to speak again, the court said

"[n]ow just close your mouth," and asked, "Mr. Plumpe, I'm not going to have to find you in contempt of Court, am I?" *Id*. at 122-23. Later, the judge admonished both attorneys to direct their comments at the bench: "And I'm, also, going to ask both of you – because I'm getting to the point where I'm not going to tolerate it anymore – that you direct your comments to this court and not to each other." *Id*., dated 10/23/96, at 100. The court continued, "You know I'm not going to let these jurors leave here thinking that I don't have control over this court room. You know that I'm not going to do that, don't you? Both of you know that, don't you?" *Id*.

Many of these comments were directed at the attorneys on both sides, and reflected the trial judge's attempt to control the courtroom. With respect to the comments directed solely at defense counsel, the comments did not disparage petitioner, his defense, or counsel himself, but were directed at counsel's conduct. In short, the trial judge's comments "were generally in response to defense counsel's combative style and his failure to accept the court's direction," the comments were not "substantially adverse to the defendant himself," and "[t]here is no showing that the trial judge ever intimated [her] opinion on the merits of the case." *Todd v. Stegal*, 40 Fed. Appx. 25, 27 (6th Cir. 2002). In these circumstances, petitioner cannot show that he was denied a fair trial by the trial judge's comments. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Prosecutorial Comments

In his eighth claim, petitioner contends that he was prejudiced by the cumulative effect of the prosecutor's misconduct. In his brief, petitioner does not identify any specific instances of prosecutorial misconduct beyond those already presented in Claims III (character evidence), IV (gang/threat evidence), VI (hearsay evidence), and VII (denigration of defense counsel). Rather,

he contends that the cumulative effect of these instances of prosecutorial misconduct deprived him of a fair trial. This claim is without merit, for two reasons.

First, as explained above with respect to Claim VII petitioner has not shown that the prosecutor committed misconduct with respect to the comments directed toward his defense counsel. The other instances of prosecutorial misconduct identified in Claims III, IV, and VI are not prosecutorial misconduct at all. In each instance, the Michigan courts determined that the evidence was properly admitted. Because the state courts concluded that this evidence was admissible, the prosecutor did not commit misconduct by introducing the evidence. *See Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Hammond v. Michigan Parole Bd.*, No. 04-73385, 2006 WL 2161028, at *16 (E.D. Mich. July 31, 2006) (Roberts, J., adopting Recommendation of Komives, M.J.). Second, as explained with respect to each claim, petitioner has failed to show a constitutional violation in connection with any of these claims.

Second, while it is true that "[e]rrors which standing alone may be deemed harmless or insufficiently prejudicial to amount to a denial of due process may cumulatively produce a trial setting which is fundamentally unfair," *Payne v. Janasz*, 711 F.2d 1305, 1316 (6th Cir. 1983) (Jones, J., dissenting); *accord Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983), this rule applies only to constitutional errors; the accumulation of non-errors cannot collectively amount to a violation of due process. *See Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir. 1999); *McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *12 (6th Cir. Sept. 27, 1995); *Fero v. Kerby*, 39 F.3d 1462, 1475 (10th Cir. 1994). Because petitioner has failed to establish constitutional error with respect to any of Claims III, IV, VI, or VII, his cumulative error argument based on these claims fails. Accordingly, the Court should conclude that petitioner is not

entitled to habeas relief on this claim.

I.      *Jury Instructions (Claims IX & XI)*

Petitioner next contends that he was denied a fair trial by the trial court's refusal to instruct the jury on the lesser offenses of manslaughter and reckless discharge of a firearm causing death. Petitioner also contends that the court erred in its response to a jury note indicating that the jury was deadlocked.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'"  *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).  If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990).  In short, instructional errors of state law will rarely form the basis for federal habeas corpus relief.  *See Estelle*, 502 U.S. at 71-72.

50

2.      *Failure to Give Lesser Offense Instructions*

Petitioner contends that he was denied a fair trial by the trial court's refusal to give lesser offense instructions on voluntary manslaughter, involuntary manslaughter, and reckless discharge of a firearm resulting in death.  The trial court and court of appeals concluded that because there was no evidence that petitioner was acting under hot blood or negligently, and because petitioner's defense was that he had no involvement in the shooting, the instructions were not warranted by the evidence.  *See* Trial Tr., dated 11/1/96, at 7-8; *Gover*, 1999 WL 33437846, at *2-*3, slip op. at 3. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Although the Eighth Amendment and the Due Process Clause require that a trial court instruct the jury on lesser included offenses in the context of a capital case, *see Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (trial court required to instruct *sua sponte* on lesser included offenses where the failure to do so would result in the jury being given an "all or nothing" choice of convicting on the capital charge or acquitting the defendant), "the Constitution does not requires a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001).  As the Sixth Circuit has noted, even where a lesser offense instruction is requested, the failure of a court to instruct on a lesser included or cognate offense in a non-capital case is generally "not an error of such magnitude to be cognizable in federal habeas corpus review." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (en banc); *see also*, *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002).  At a minimum, there is no clearly established Supreme Court law which requires the giving of a requested lesser offense instruction in the non-capital context, as is required for habeas relief under § 2254(d)(1).  *See Samu v. Elo*, 14 Fed. Appx. 477, 479 (6th Cir. 2001); *Kuroda v. Bell*, No. 2:07-CV-12310, 2007 WL 1657410, at *2 (E.D. Mich. June 7, 2007) (Cohn, J.);

*Adams v. Smith*, 280 F. Supp. 2d 704, 717 (E.D. Mich. 2003) (Tarnow, J.). Thus, the Michigan Court of Appeals's resolution of this claim was not contrary to, or an unreasonable application of, clearly established federal law, and petitioner is therefore not entitled to habeas relief on this claim.

The cases relied upon by petitioner are inapposite. *Schad v. Arizona*, 501 U.S. 624 (1991), was a capital case to which the *Beck* rule clearly applied. The Supreme Court has often noted that "the penalty of death is qualitatively different from a sentence of imprisonment, however long," *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality op.), and thus its capital punishment decisions have little applicability outside the capital punishment context. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) ("We have drawn the line or required individualized sentencing at capital cases, and see no basis for extending it further."); *Lankford v. Idaho*, 500 U.S. 110, 125 n.21 (1991) (limiting holding to capital punishment context). *Keeble v. United States*, 412 U.S. 205 (1973), is likewise inapposite, because that case was decided as a matter of federal criminal law under FED. R. CRIM. P. 31(c), and not as a matter of federal constitutional law. In two cases, courts of appeals have held that the *Beck* rule applies equally to non-capital proceedings. *See Vujosevic v. Rafferty*, 844 F.2d 1023, 1027 (3d Cir. 1988); *Ferrazza v. Mintzes*, 735 F.2d 967, 968 (6th Cir. 1984). Neither of these court of appeals decisions, however, constitutes "clearly established federal law as determined by the Supreme Court" under § 2254(d)(1). Further, neither decision remains controlling even apart from the clearly established federal law requirement. The courts in the Third Circuit have noted that the viability of *Vujosevic* is doubtful after the Supreme Court's decision in *Schad*. *See Geschwendt v. Ryan*, 967 F.2d 877, 885 n.14 (3d Cir. 1992); *Peoples v. Cathel*, No. 05-5916, 2006 WL 3419787, at *7 (D.N.J. Nov. 21, 2006). And in *Bagby*, *supra*, the en banc Sixth Circuit expressly adopted the rule that *Beck* does not apply to non-

52

capital proceedings, implicitly overruling *Ferrazza*. *See Bagby*, 894 F.2d at 797.

Further, petitioner cannot show that he was entitled to a voluntary or involuntary manslaughter instruction in light of the evidence presented at trial. "In Michigan, the penalty for manslaughter is codified, but the definition is left to the common law." *People v. Datema*, 448 Mich. 585, 593, 533 N.W.2d 272, 276 (1995). In *Datema*, the court noted that "[c]ommon-law manslaughter has two broad categories: voluntary and involuntary," and further explained that the "two categories entail distinct elements and apply in different circumstances, but are often misapplied." *Id.* at 594, 533 N.W.2d at 276. Attempting to clarify the distinction between voluntary and involuntary manslaughter, the *Datema* court explained that manslaughter in general is "any homicide which is neither murder nor innocent homicide, and such a killing may be either intentional or unintentional." *Id.* (internal quotation omitted). The court further explained that "[v]oluntary manslaughter is any killing with a person-endangering state of mind that is neither murder nor innocent homicide, or an unlawful homicide with a person-endangering state of mind that would be murder in the absence of mitigation." *Id.* And, the court explained, "[i]nvoluntary manslaughter is a catch-all concept including all manslaughter not characterized as voluntary[.]" *Id.*

Turning to involuntary manslaughter more specifically, the court reaffirmed its longstanding definition of the crime:

> "the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty."

*Id.* at 595-96, 533 N.W.2d at 276 (quoting *People v. Ryczek*, 224 Mich. 106, 110, 194 N.W. 609, 611 (1923) (internal quotation omitted)). The court explained that "[t]his definition sets forth three different theories giving rise to involuntary manslaughter liability. These theories are not mutually

53

exclusive, and, under the proper circumstances, multiple theories may be appropriate." *Id*. at 596, 533 N.W.2d at 276-77.

Conversely, under Michigan law voluntary "[m]anslaughter is murder without malice." *People v. Mendoza*, 468 Mich. 527, 534, 664 N.W.2d 685, 689 (2003). "Murder and manslaughter are both homicides and share the element of being intentional killings. However, the element of provocation . . . characterizes the offense of manslaughter [and] separates it from murder." *People v. Pouncey*, 437 Mich. 382, 388, 471 N.W.2d 346, 350 (1991). Thus, "[u]nder Michigan law, 'voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation, and before a reasonable time has passed for the blood to cool and reason to resume its habitual control.'" *Todd v. Stegal*, 40 Fed. Appx. 25, 29 (6th Cir. 2002) (quoting *People v. Fortson*, 202 Mich. App. 13, 19, 507 N.W.2d 763, 767 (1993)). In other words, "to show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *Mendoza*, 468 Mich. at 535-36, 664 N.W.2d at 690.

Not every form of provocation, however, will suffice to negate the malice necessary for murder. As the Michigan Supreme Court has explained,

> [t]he provocation necessary to mitigate a homicide from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. . . .
>    In addition, the provocation must be adequate, namely, that which would cause the reasonable person to lose control. Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter. The law cannot countenance the loss of self-control; rather, it must encourage people to control their passions.

*Pouncey*, 437 Mich. at 389, 471 N.W.2d at 350; *see also*, *People v. Sullivan*, 231 Mich. App. 510, 518, 586 N.W.2d 578, 582 (1998).

54

Here, there was no evidence presented at trial that would have supported a finding of guilty of voluntary or involuntary manslaughter. With respect to voluntary manslaughter, the bulk of the evidence showed that petitioner's codefendants were robbed the day before, and in response deliberately set out to find the perpetrators armed with guns, and fired shots from the car. This evidence was sufficient to show beyond a reasonable doubt that petitioner, at a minimum, acted with the intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result–*i.e.*, with malice aforethought. *See Jackson v. Withrow*, No. 99-74892, 2002 WL 482551, at *5 (E.D. Mich. Feb. 28, 2002) (Cohn, J.); *People v. Abraham*, 256 Mich. App. 265, 270, 662 N.W.2d 836, 841 (2003); *People v. Williams*, No. 234936, 2002 WL 31930868, at *1 (Mich. Ct. App. Nov. 15, 2002) (per curiam). Further, the lapse of time between the initial robbery and the shooting negates, as a matter of law, any finding that petitioner and his codefendants were acting under the heat of passion. *See Todd*, 40 Fed. Appx. at 29; *Draughn v. Jabe*, 803 F. Supp. 70, 76 (E.D. Mich. 1992) (Gadola, J.), *aff'd*, 989 F.2d 499 (6th Cir. 1993) (unpublished); *Pouncey*, 437 Mich. at 392, 471 N.W.2d at 351 ("After a few insults were exchanged, the defendant went into the house, a safe harbor. There was no evidence that the defendant was compelled to go back outside by anyone. . . . Instead, the defendant chose to retrieve the shotgun from the closet in the back of the house and chose to go back outside.").

Nor is there any evidence in the record which would have supported a finding of guilty of involuntary manslaughter. A rational view of the evidence would not allow a jury to conclude that the shootings were the result of mere negligence or recklessness. Rather, the evidence showed that the defendants committed a deliberate act–shooting at people from a vehicle–which has a natural tendency to cause death or great bodily harm. A properly instructed jury could not have found

involuntary manslaughter under these facts.

Petitioner contends that the manslaughter instructions were supported by Ratliff's statement to the police that the shooting began when one of the men on the porch made a threatening gesture and grabbed for something under his shirt, and by Ursula Griggs's testimony that she saw someone shooting towards the car. Even crediting these statements, however, the jury could not have found petitioner guilty of voluntary or involuntary manslaughter. Rather, these statements would have been relevant, if at all, to a self-defense theory. And, again, these instructions would have contradicted petitioner's own testimony, which asserted that he was simply not involved in the shootings.

Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.    *Response to Jury Note*

Petitioner also contends that he was denied a fair trial by the court's handling of a note from the jury indicating that they were deadlocked. On the second day of deliberations, the jury sent a note to the court indicating that it needed "help" understanding the premeditation and deliberation elements of the first degree murder charge, and the court instructed the jury on the definitions of premeditation and deliberation. *See* Trial Tr., dated 11/7/96, at 17-18. The following day, the jury sent the court a noted indicating that it could not reach agreement. The trial court then gave a deadlocked jury instruction:

> And what I'm going to do right now is give you another instruction. And hopefully that instruction may help you somewhat or help you a lot, and ask that you continue your deliberations.
>
> You have returned from deliberations indicating that you believe you could not reach a verdict. I am going to ask you to please return to the jury room and resume your deliberations in the hope that after further discussion you will be able

to reach a verdict.

       As you deliberate, please keep in mind the guidelines that I have you earlier. Remember it is your duty to consult with your fellow jurors and try to reach agreement if you can do so without violating your own judgment. To return a verdict, you must all agree, and the verdict must represent the judgment of each of you. As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness. Naturally, there will be differences of opinion. You should each not only express your opinion but also give the facts and the reasons on which you base it. The facts meaning the evidence that was presented in this case. By reasoning the matter out, jurors can often reach agreement.

       When you continue your deliberations, do not hesitate to rethink your own view and change your opinion if you decide you were wrong. However, none of you should give up your honest belief about the weight and affect [sic] of the evidence only because of what your fellow jurors think or only for the sake of reaching a verdict.

       Now this case took approximately seven days to try, and I think that we have to at least give it that much effort to see if we can resolve it. Okay? All right.

Trial Tr., dated 11/7/96, at 5-6.

The following day, the jury again sent a note indicating that it was deadlocked. Specifically, as related by the trial judge, the note stated:

       Judge, we are still at the point of no, no is underlined, movement. We are struggling with the fact that some people do not and will not, do not, will not underlined, come to the belief that the defendant ever intended to kill. Some of us believe he did, but in hot blood. And one person believes he was not hot-blooded during deliberation and premeditation. We are stuck.

Pet'r's Amended Br., at 72 (quoting Trial Tr., dated 11/8/96).[6] The trial court denied petitioner's motion for mistrial, and instructed the jury to continue deliberations. The court also instructed the jury that "[t]he term hot blood is a legal term. It doesn't simply mean that a person was angry. It has a different meaning than most lay people would think. That term that legal term of hot blood does not apply to this case. All right?" *Id.* at 73. Petitioner contends that these instructions coerced

---

      [6]The November 8, 1996, transcript is not included as part of the Rule 5 materials filed by respondent. For purposes of resolving petitioner's claim, I assume that petitioner's brief accurately reflects the transcript.

the jury's verdict.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a.  Clearly Established Law

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district in wherein the crime shall have been committed[.]" U.S. CONST. amend. VI.  Although this provision has been interpreted as requiring jury unanimity in federal prosecutions, this requirement has not been applied to the state's through the Due Process Clause of the Fourteenth Amendment.  Thus, as a general matter, there is no constitutional requirement that a state criminal jury reach a unanimous verdict, *see Schad v. Arizona*, 501 U.S. 624, 630 (1991) (plurality opinion); *Brown v. Louisiana*, 447 U.S. 323, 330-31 (1980); *Apodaca v. Oregon*, 406 U.S. 404, 410-11 (1972) (plurality opinion),[7] and a jury unanimity claim, standing alone, will therefore afford no basis for habeas relief, *see Carlyle v. Rowland*, No. 91-55385, 1992 WL 122254, at *1 (9th Cir. June 3, 1992).

Nevertheless, where, as here, state law requires juror unanimity, *see People v. Cooks*, 446 Mich. 503, 510-11, 521 N.W.2d 275, 278 (1994); MICH. CONST. art. 1, § 14 (1963), the failure of the jury to reach a unanimous verdict or its reaching of such a verdict only through some sort of coercion applied to one or more of the jurors may constitute a denial of due process of law in violation of the Fourteenth Amendment.  *See Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988) ("Any criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body.").  In cases such as this one, where the criminal defendant alleges that unanimity was achieved only

---

[7]In certain situations a state criminal defendant may have a constitutional due process right to a unanimous verdict, such as where he is tried before a six-person jury.  *See Brown*, 447 U.S. at 331.  However, these circumstances are not present here.

through the trial judge's coercive instructions or conversations with the jurors, the court must review the totality of the circumstances surrounding the instructions or comments and the context in which they were given to evaluate whether the judge's conduct had a coercive effect on one or more jurors. *See United States v. Frost*, 125 F.3d 346, 373 (6th Cir. 1997) (direct appeal from federal conviction); *Williams v. Parke*, 741 F.2d 847, 850 (6th Cir. 1984) (habeas corpus review of state conviction).

### b. Analysis

Here, petitioner has failed to show that the trial judge's instructions were coercive. The trial judge repeatedly instructed the jurors that, in their continued deliberations, the jurors should consider the evidence and reasoning of their fellow jurors, but should not give up their honest beliefs.

It is well established that "[a] judge may encourage jurors who are having difficulty reaching a verdict to deliberate longer[.]" *United States v. Straach*, 987 F.2d 232, 242 (5th Cir. 1993) (citing *Allen v. United States*, 164 U.S. 492 (1896)). Such an instruction is improper only if it "unduly coerces the minority into surrendering its views for the purpose of reaching a verdict, or sets a time limit for the deliberations." *Id*. (internal quotation omitted). Here, the trial judge simply instructed the jury to continue deliberations. He did not indicate that the jury should reach a particular result, or that any juror should sacrifice his or her own views; in fact, he instructed just the opposite. The courts have uniformly held that this type of neutral instruction is not coercive. As the Eleventh Circuit recently explained: "The judge's simple request that the jury continue to deliberate . . . was routine and neutral. Nothing in the brief instruction suggested that a particular outcome was either desired or required and it was not 'inherently coercive.'" *United States v. Prosperi*, 201 F.3d 1335, 1341 (11th Cir. 2000). Likewise, the Seventh Circuit has explained that "an instruction to continue

to deliberate after the jury had declared that it had reached an impasse is perfectly content neutral and carries no plausible potential for coercing the jury to surrender their honest opinions for the mere purpose of returning a verdict." *United States v. Kramer*, 955 F.2d 479, 489 (7th Cir. 1992) (internal quotations omitted); *accord United States v. Frazin*, 780 F.2d 1461, 1470-71 (9th Cir. 1986).

In short, the instruction lacked any of the traditional indicia of a coercive instruction: the court did not mention the expense of a retrial; the court did not suggest that any juror abandon his or her views; the court did not instruct or suggest that the jury had to reach a particular verdict, or indeed any verdict at all, but only that the jury should try to reach a verdict, if possible; and the instruction was not given in an atmosphere of frustration over the deadlock. Thus, the instruction was not coercive. *See United States v. Nelson*, 137 F.3d 1094, 1109-10 (9th Cir. 1998).

Petitioner suggests that the coercive nature of the instruction is demonstrated by the fact that the jury note indicated that at least some jurors thought that petitioner acted under "hot blood," and that the court's statement that "hot blood" had nothing to do with the case and its reinstruction on first and second degree murder without then giving a manslaughter instruction coerced the jury into a guilty verdict on second degree murder. However, the trial judge's instruction to the jury was accurate. As the trial judge explained, "hot blood" in criminal law is a legal term of art, and the fact that one or more jurors might have thought that petitioner was acting while angry did not equate to a belief that petitioner was acting under the "hot blood" that, as a legal matter, reduces murder to manslaughter. And, in any event, one or more jurors indicating that they thought petitioner was acting under "hot blood" does not change the calculus as to whether the evidence adduced at trial was such as to support the giving of a voluntary or involuntary manslaughter instruction.

60

Petitioner's argument, essentially, is that the trial judge deprived the jury of the opportunity to reach a compromise verdict on a lesser manslaughter offense which was not supported by the evidence. Petitioner, however, had no right to such a compromise verdict, which in essence is nothing more than a form of jury nullification. Several rules provide that jury verdicts are unassailable, and thus a jury has the power to acquit "in the teeth of both law and facts." *Horning v. District of Columbia*, 254 U.S. 135, 138 (1920). However, "while jurors have the power to nullify a verdict, they have no right to do so." *Merced v. McGrath*, 426 F.3d 1076, 1079 (9th Cir. 2005) (citing *Standefer v. United States*, 447 U.S. 10, 22-23 (1980)). Jury nullification is simply a jury's "assumption of a power which [it] had no right to exercise, but to which [it was] disposed through lenity." *Standefer*, 447 U.S. at 22. Because a jury has the power but not the right to nullify, and because nullification amounts to a breach of a juror's sworn duty to follow the law, not only do trial courts have no duty to safeguard the nullification prerogative but have the affirmative "'duty to forestall or prevent such conduct.'" *Merced*, 426 F.3d at 1080 (quoting *United States v. Thomas*, 116 F.3d 606, 616 (2d Cir. 1997). Thus, the trial court's depriving the jury of the ability to reach a compromise verdict by instructing on voluntary manslaughter in light of the jury's note does not entitle petitioner to habeas relief, and no cases suggest otherwise. On the contrary, the cases that have addressed the issue are uniform in concluding that "a lesser offense charge is not available to the defendant on the ground that the rule entitles him to plead for mercy. It is both unreasonable and impermissible to provide the jury with an opportunity to render a lenient or compromise verdict with no evidentiary basis." *United States v. Busic*, 592 F.2d 13, 25 (2d Cir. 1978) (citation omitted); *accord United States v. Finley*, 477 F.3d 250, 255-56 (5th Cir. 2007); *United States v. Trujillo*, 497 F.2d 408, 409 (10th Cir. 1974); *Kelly v. United States*, 370 F.2d 227, 229 (D.C. Cir. 1966); *Flum*

61

*v. McKee*, No. 04-CV-72671, 2005 WL 2319006, at *13 (E.D. Mich. Sept. 21, 2005) (Edmunds, J.);

*Dukette v. Perrin*, 564 F. Supp. 1530, 1537 (D.N.H. 1983).

In short, the trial judge's instructions to the jury to continue deliberations and attempt to reach a verdict did not coerce any juror to surrender his or her views or suggest that the jury must reach a verdict at all, much less any particular verdict. And because the evidence did not support a manslaughter instruction, the trial court's failure to give a manslaughter instruction in response to the jury note neither coerced the jury's verdict nor deprived petitioner of any federal constitutional right. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

J.      *Sufficiency of the Evidence (Claim X)*

Petitioner next contends that the evidence was insufficient to support submitting the first degree murder charge to the jury. Although petitioner was acquitted on this charge, he contends that its submission to the jury deprived him of a fair trial because it may have induced the jury to find him guilty of second degree murder as a compromise verdict. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case."  *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).  Accordingly, it is necessary to examine the elements of second degree murder under Michigan law.

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment.  *See* MICH. COMP. LAWS § 750.317.  To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought.  In order to show malice aforethought, the prosecution must establish one of

three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. These include murder done with premeditation and deliberation or committed in the course of certain enumerated felonies. *See* MICH. COMP. LAWS § 750.316(1)(a), (b).

Under Michigan law, "[p]remeditation is measured in time; time to permit a reasonable person to subject the nature of his response to a second look." *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984). "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995). Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct after the killing. *See id*.; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597. Further, because first degree murder requires premeditation and deliberation rather than simply malice aforethought (as is required for second degree murder), the actor must have the specific intent to kill in order to be convicted of first degree murder. *See People v. Hart*, 437 Mich. 898, 898, 465 N.W.2d 328, 328 (1991); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 715 n.102, 299 N.W.2d 304, 320 n.120 (1980). As with premeditation, "[t]he specific intent to kill may be proven by inference from any facts in evidence." *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (internal quotation omitted).

Specifically, and in addition to other factors, the Court "may take into consideration 'the nature of the defendant's acts constituting the assault . . . [and] whether the instrument and means used were naturally adapted to produce death[].'" *Id.* (quoting *People v. Taylor*, 422 Mich. 554, 375 N.W.2d 1, 8 (1985)).

    2.    *Analysis*

At the outset, because petitioner was acquitted of the first degree murder charge, the existence of insufficient evidence to support the first degree murder charge does not provide a basis for habeas relief. Although *Winship* and *Jackson* clearly establish that it is a due process violation to *convict* a defendant on a charge for which there is insufficient evidence, "the Supreme Court has never held that the submission of a charge, upon which there is insufficient evidence, violates a defendant's constitutional rights where the defendant is acquitted of that charge." *Long v. Stovall*, 450 F. Supp. 2d 746, 752 (E.D. Mich. 2006) (Gadola, J.); *see also*, *Thomas v. Bell*, No. 2:06-13165, 2008 WL 268892, at *5 (E.D. Mich. Jan. 29, 2008) (Borman, J.); *Aldrich v. Bock*, 327 F. Supp. 2d 743, 761-62 (E.D. Mich. 2004) (Cleland, J., adopting Report of Majzoub, M.J.). The acquittal on the greater charge renders the submission of that charge harmless. *See Long*, 450 F. Supp. 2d at 752; *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 596 (E.D. Mich. 2001) (Tarnow, J.). This is the basis upon which the Michigan Court of Appeals rejected petitioner's claim. *See Gover*, 1999 WL 33437846, at *5-*6, slip op. at 6-7.

Petitioner relies on the Supreme Court's decision in *Price v. Georgia*, 398 U.S. 323 (1970), as constituting clearly established law. In that case, the defendant had been tried for murder and convicted of the lesser offense of voluntary manslaughter. The manslaughter conviction was overturned on appeal on the basis of an erroneous jury instruction, and the defendant was retried on

65

both the murder and manslaughter charges.  At the retrial, the defendant was again found guilty on

the lesser manslaughter offense.  The defendant appealed, claiming that the retrial on the murder

charge violated his right to be free of double jeopardy.  The Supreme Court agreed, and overturned

petitioner's conviction.  *See id*. at 324-30.  In doing so, the Court rejected the state's argument that

the error in proceeding on the double jeopardy-barred murder count was harmless in light of the fact

that the defendant was only convicted on the non-barred manslaughter charge, explaining that "we

cannot determine whether or not the murder charge against petitioner induced the jury to find him

guilty of the less serious offense of voluntary manslaughter rather than to continue to debate his

innocence."  *Id*. at 331.  In *Williams v. Jones*, 231 F. Supp. 2d 586 (E.D. Mich. 2002), Judge Lawson

concluded that this

> harmless error analysis in *Price* establishes the rule that the unconstitutional
> submission of a greater charge to a jury is not harmless beyond a reasonable doubt
> simply because the jury convicts on a lesser, but properly submitted, charge.  It
> makes little difference that the basis upon which the submission was improper is the
> Double Jeopardy Clause or the Due Process Clause.  The net effect is the same.
> Thus, if the trial judge's submission of the first-degree murder charge in the
> petitioner's trial violated the constitution, the error would not have been harmless
> because the jury may have improperly considered, and compromised from, a charge
> to which it never should have been exposed.  To hold otherwise would constitute an
> unreasonable application of *Price*.

*Id*. at 594.  Petitioner relies on *Price*, and Judge Lawson's explication of *Price*, in support of his

claim.

With due respect to Judge Lawson, the Court should reject this reasoning because *Price* will

not support the weight placed upon it, particularly in light of the clearly established law principle

embodied in § 2254(d)(1).  *Price* does not directly control, it being a case decided under the Double

Jeopardy Clause, and thus the question is whether a state court would be unreasonable in declining

to extend the *Price* harmless error analysis to the submission of a charge for which there was

insufficient evidence.  For several reasons, such a failure to extend *Price* is not unreasonable.

First, the *Price* harmless error rule, which appears to establish a rule of *per se* harmfulness, is no longer controlling law even in the double jeopardy context.  In *Morris v. Mathews*, 475 U.S. 237 (1986), the defendant was tried and convicted on a jeopardy-barred charge.  The state appellate court, to remedy the double jeopardy violation, entered a verdict on non-barred lesser included offense, but the federal court granted habeas relief concluding that the defendant had been prejudiced by the submission of the jeopardy-barred charge to the jury.  The Supreme Court reversed the grant of habeas relief, and in doing so rejected the defendant's argument, based on *Price*, that he need not show actual prejudice arising from the submission of the jeopardy-barred charge to the jury.  The Court explained that "[t]he holding in *Price* did not impose an automatic retrial rule whenever a defendant is tried for a jeopardy-barred crime and is convicted of a lesser included offense." *Id*. at 245.  Rather, the Court held, "when a jeopardy-barred conviction is reduced to a conviction for a lesser included offense which is not jeopardy barred, the burden shifts to the defendant to demonstrate a reasonable probability that he would not have been convicted of the nonjeopardy-barred offense absent the presence of the jeopardy barred offense." *Id*. at 246-47.  Thus, the statement from *Price* relied upon by petitioner and the court in *Williams* has been significantly undermined.

Second, no case law suggests that the double jeopardy rule established in *Price* should be incorporated into the sufficiency of the evidence context raised here.  In *Williams*, Judge Lawson explained the *Price* harmless error rule as being "that the *unconstitutional submission* of a greater charge to a jury is not harmless beyond a reasonable doubt simply because the jury convicts on a lesser, but properly submitted charge." *Williams*, 231 F. Supp. 2d at 594 (emphasis added).  The

67

applicability of this rule in the double jeopardy context is clear, because a constitutional violation occurs the moment a defendant is tried on a jeopardy-barred charge regardless of the outcome of the case. The Court made this point explicit in *Price*: "The Double Jeopardy Clause, as we have noted, is cast in terms of the risk or hazard of trial and conviction, not of the ultimate legal consequences of the verdict." *Price*, 398 U.S. at 331; *see also*, *Yeager v. United States*, 557 U.S. ___, slip op. at 6-7 (June 18, 2009) (internal quotation omitted) (explaining that the principle interest protected by the Double Jeopardy Clause is that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity[.]"); *United States v. Ball*, 163 U.S. 662, 669 (1896) ("The prohibition is not against being twice punished, but against being twice put in jeopardy."); *Saylor v. Cornelius*, 845 F.2d 1401, 1408 (6th Cir. 1988) ("We believe that the Double Jeopardy Clause forbids a second trial on the accomplice liability theory because such a trial would be vexatious, regardless of the outcome of the jury's deliberation on the theory charged to it."). Thus, submission of a jeopardy-barred claim to the jury is itself an "unconstitutional submission of a greater charge to a jury," in the words of *Williams*. Applying this principle to the sufficiency of the evidence context, however, simply begs the question. This is because no Supreme Court decision suggests that the mere submission of a charge not supported by sufficient evidence itself amounts to a constitutional violation. Thus, contrary to *Williams* it makes not a "little difference," but a large and important difference that the basis upon which petitioner claims the charge was improperly submitted is sufficiency of the evidence rather than double jeopardy. *See generally*, *Williams v. United States*, 858 A.2d 984, 1004-05 (D.C. 2004).

68

Taken together, the weakening of *Price*'s harmless error rule in *Mathews* and the important distinction between double jeopardy and sufficiency of the evidence claims themselves provide a reasonable basis for a state court to conclude that the submission of a greater charge for which there is insufficient evidence is harmless when the defendant is acquitted of that charge. The reasonableness of this conclusion is buttressed by several additional factors. First, not a single court apart from *Williams*, and certainly no Supreme Court decision, has adopted the rule set forth in *Williams*. Second, the rule adopted in *Williams* essentially permits an argument in favor of partial nullification, which as noted above contradicts a long and well-established line of decisions. And third, the rule adopted in *Williams* ignores the long and well-established line of decisions holding that jurors are presumed to follow the instructions given by the court. *See Valdez v. Bravo*, 244 Fed. Appx. 864, 869 (10th Cir. 2007) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)) ("We decline to adopt such an approach because it would require this court to ignore the principle that jurors are presumed to follow the instructions given."). For these reasons, the Court should conclude that the Michigan Court of Appeals did not unreasonably apply clearly established law in finding that the submission to the jury of the first degree murder charge was harmless in light of petitioner's acquittal on that charge.

Even were the Court to conclude that petitioner's claim is otherwise cognizable on habeas review and that the acquittal on the first degree murder charge did not render the submission of that charge to the jury harmless, the Court should nevertheless conclude that petitioner is not entitled to habeas relief on this claim because the evidence presented at trial was, in fact, sufficient to warrant submitting the first degree murder charge to the jury.

Petitioner contends that there was insufficient evidence that he intended to kill, arguing that

based on the evidence "[a] juror might indeed <u>speculate</u> on Petitioner's intent, but this Court must base its rulings on the actual testimony of witnesses with personal knowledge, not on what someone else might speculate." Pet'r's Amended Br., at 70. Petitioner's argument essentially requires that intent be proved by direct evidence, an argument which is not supported by law. As the Sixth Circuit has explained, the absence of direct evidence of intent is "a situation that is not unusual in murder cases generally. Rarely is direct evidence of premeditation and intent available in a murder case, except where a confession is received in evidence." *DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998). For this reason, it is well established that intent to kill need not be proved by direct evidence, but rather may be proved by circumstantial evidence and reasonable inferences drawn from the evidence. *See Warren*, 161 F.3d at 360; *Hoffman*, 225 Mich. App. at 111, 570 N.W.2d at 15. The jury's duty in such a case is to "examine the evidence of [petitioner's] conduct and infer what he thought and what he intended to do from what he did and failed to do." *DeLisle*, 161 F.3d at 389. Specifically, and in addition to other factors, the Court "may take into consideration 'the nature of the defendant's acts constituting the assault . . . [and] whether the instrument and means used were naturally adapted to produce death[].'" *Warren*, 161 F.3d at 360 (quoting *People v. Taylor*, 422 Mich. 554, 375 N.W.2d 1, 8 (1985)).

Here, there was evidence presented which, if believed by the jury, established that petitioner and his codefendants set out looking for "Ricky" and his friends to avenge Ricky's robbery of Ratliff the previous evening, that they did so armed with guns, and that they opened fire at the men on the porch from the car. Further, one witness testified that immediately after the shooting petitioner stated that he hoped he had killed one of the men on the porch. Even in the absence of any direct evidence that he expressed an intent to kill or succeeded in injuring the person at whom he was

70

firing, these facts are sufficient to support an inference that petitioner intended to kill and constitute sufficient evidence from which the finder of fact could infer beyond a reasonable doubt that petitioner acted with the intent to kill. *See Johnigan v. Elo*, 207 F. Supp. 2d 599, 608 (E.D. Mich. 2002) (Steeh, J.); *People v. Ritsema*, 105 Mich. App. 602, 609, 307 N.W.2d 380, 383 (1981); *People v. Johnson*, 54 Mich. App. 303, 304, 220 N.W.2d 705, 706 (1974). Such a conclusion is not speculation, but rather a fair "infer[ence of] what [petitioner] thought and what he intended to do" based on "the evidence of [petitioner's] conduct." *DeLisle*, 161 F.3d at 389. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these claims.

K.      *Sentencing Claims (Claims XII and XIII)*

Petitioner next raises two challenges to his sentence. First, he claims that the trial judge was biased against him at sentencing. Second, he contends that his sentence was impermissibly based on his failure to admit guilt.

1.      *Biased Sentencing Judge (Claim XII)*

After trial but before sentencing, petitioner filed a motion to disqualify the trial judge on the basis that she was biased against him. The trial court denied the motion, and the Michigan Court of Appeals rejected petitioner's claim, concluding that there was no evidence of actual bias. The Court should conclude that this determination was reasonable, and that petitioner is therefore not entitled to habeas relief on this claim.

a. *Clearly Established Law*

Perhaps "[n]o right is more fundamental to the notion of a fair trial than the right to an impartial judge." *Bracy v. Gramley*, 81 F.3d 684, 696 (7th Cir. 1996) (Rovner, J., dissenting), *rev'd*, 520 U.S. 899 (1997); *see also*, MASS. CONST. of 1780, pt. 1, art. 29. Thus, "the Due Process Clause

clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy*, 520 U.S. at 904-05 (citation omitted) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). "Because judicial bias infects the entire trial process it is not subject to harmless error review." *Maurino v. Johnson*, 210 F.3d 638, 645 (6th Cir. 2000) (citing *Chapman v. California*, 386 U.S. 18, 23 & n. 8 (1966)); *see also*, *Rose v. Clark*, 478 U.S. 570, 577 (1986) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)).

Habeas relief on the basis of judicial bias is appropriate only if "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). As a general matter, habeas relief will be appropriate only upon a showing that the trial judge was actually biased or prejudiced against the petitioner. *See Fero v. Kerby*, 39 F.3d 1462, 1478 (10th Cir. 1994). However, in exceptional circumstances "the likelihood of bias or appearance of bias can, in certain circumstances, be so substantial as to create a conclusive presumption of actual bias." *Id*. (internal quotation omitted). The appearance of bias situation is limited to cases in which "a judge is faced with circumstances that present some actual incentive to find one way or the other[,]" *id*. (internal quotation omitted); *see also*, *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc), such as where the judge has a pecuniary interest in the outcome or has been the target of repeated abuse by one of the parties. *See Six v. Delo*, 885 F. Supp. 1265, 1271 (E.D. Mo. 1995), *aff'd*, 94 F.3d 469, 478 (8th Cir. 1996).

As the Supreme Court has noted in the context of the federal recusal statute, "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the

case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *see also*, *Liteky v. United States*, 510 U.S. 540, 549-51 (1994); *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988). For this reason,

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved.

*Liteky*, 510 U.S. at 555. Thus, "[a] judge's ordinary efforts at courtroom administration–even a stern and short-tempered judge's ordinary efforts at courtroom administration–remain immune." *Id.* at 556. Although *Liteky* was decided on the basis of the federal recusal statute, it provides guidance for resolving habeas claims of judicial bias. *See Maurino*, 210 F.3d at 645; *Poland v. Stewart*, 117 F.3d 1094, 1103-04 (9th Cir. 1997).

### b. Analysis

In his brief, petitioner points to a number of instances in which he contends that the trial judge demonstrated bias toward him. Each instance, however, involves either the trial court's ruling on a particular matter or admonishing defense counsel. *See* Pet'r's Amended Br., at 78-81. Petitioner does not point to any personal bias against petitioner derived from any extrajudicial source. As noted above "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. Likewise, in assessing a judicial bias claim, a court must "differentiate between expressions of impatience, annoyance or ire, on the one hand, and bias or partiality on the other hand." *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997). Here, the judge's comments to counsel "show little more than the judge's efforts to expedite the trial[] and maintain courtroom decorum." *Id.* Regardless of whether the judge's efforts were appropriate, they do not demonstrate bias against petitioner. *Liteky*, 510 U.S. at 556 ("A judge's ordinary efforts at

73

courtroom administration–even a stern and short-tempered judge's ordinary efforts at courtroom administration–remain immune."). As the Supreme Court has explained, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel . . . ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. The judge's comments, regardless of their propriety, do not of themselves give rise to an appearance of partiality and do not establish that she was actually biased against petitioner, and it cannot be said that the Michigan Court of Appeals's determination was an unreasonable application of clearly established law. *See Jones v. Luebbers*, 359 F.3d 1005, 1014-15 (8th Cir. 2004); *Allen v. Hawley*, 74 Fed. Appx. 457, 460-61 (6th Cir. 2003); *Copeland v. Walker*, 258 F. Supp. 2d 105, 136-37 (E.D.N.Y. 2003). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Sentencing Based on Failure to Admit Guilt (Claim XIII)*

Petitioner also claims that he was improperly sentenced based on his failure to admit guilt, in violation of his Fifth Amendment right against self-incrimination. The Court should agree, and conclude that petitioner is entitled to habeas relief on this claim.

*a.   Analysis*

This claim is controlled by the Sixth Circuit's decision in *Ketchings v. Jackson*, 365 F.3d 509 (6th Cir. 2004), which involved petitioner's codefendant Robert Ketchings. In that case, the court sentenced Ketchings to a minimum term of 40 years' imprisonment on the murder conviction, despite the guidelines recommending a range of 10-25 years' imprisonment on the minimum. In imposing sentence the court "referred negatively directly and indirectly to Ketchings's continued assertion of his belief in his innocence and implied that Ketchings would be sentenced more leniently if he accepted the jury's verdict." *Id*. at 513. Specifically, the trial court made statements

74

to Ketchings at the time of sentence such as: "The first thing I have to say is that you indicate to the Court that you're not guilty"; "And I'm sort of upset that you don't acknowledge that you did something wrong at this point;" and "[o]ne of the issues we discussed here is can you be rehabilitated? And you can't be rehabilitated if you say you didn't do anything." *Id.* The Michigan Court of Appeals denied Ketchings's claim on appeal, reasoning that the trial judge's comments made it clear that the sentence imposed was based on the trial judge's assessment of Ketchings's lack of remorse and rehabilitative potential. *See id.* at 512.

The Sixth Circuit upheld Judge Edmunds's grant of habeas relief to Ketchings on this claim. The court began by explaining the relevant clearly established federal law:

> The Supreme Court has held that a defendant's Fifth Amendment right against self-incrimination "is fulfilled only when a criminal defendant is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.'" *Estelle v. Smith*, 451 U.S. 454, 468 (1981) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)). This guarantee extends to the sentencing phase of the trial. *Mitchell v. United States*, 526 U.S. 314, 328-29 (1999).

*Ketchings*, 365 F.3d at 512 (parallel citations omitted). The court then held that the Michigan Court of Appeals had unreasonably applied this clearly established law in upholding Ketchings's sentence. The court explained that "[a]n objective review of the transcript makes clear that the sentencing judge was not, as the Michigan Court of Appeals found, merely addressing the factor of remorsefulness in the context of defendant's rehabilitative potential." *Id.* at 513. On the contrary, the judge's comments indicated that the judge was focused on Ketchings's repeated and continued refusal to admit guilt. *See id.* Further, the Michigan Court of Appeals's characterization of the judge's comments was belied by the fact that the defendant had, during allocution, expressed remorse for the family of the victim. *See id.* at 514. The Sixth Circuit accordingly affirmed Judge

Edmunds's grant of the writ, which required the state to grant Ketchings a new sentencing proceeding before a different judge.

*Ketchings* is nearly identical to this case, and demonstrates the unreasonableness of the Michigan Court of Appeals's conclusion, identical to its conclusion in *Ketchings*, that the trial judge's remarks were merely discussing petitioner's remorsefulness in light of his rehabilitative potential. *See Gover*, 1999 WL 33437846, at *11, slip op. at 12. As in *Ketchings*, petitioner's minimum sentence of 60 years' imprisonment vastly exceeded his recommended guideline range of 10-25 years' imprisonment on the minimum. As in *Ketchings*, prior to the court imposing sentence petitioner, while not admitting guilt, did express remorse at what had happened. *See* Sentence Tr., at 20. As in *Ketchings*, the trial judge's comments focused on petitioner's continued assertions of his innocence and his refusal to admit guilt. Indeed, the trial judge's comments in petitioner's case were even more focused on his failure to admit guilt than in *Ketchings*:

> You have a history of following bad advice, ignoring good advice. And I, also, noticed during the trial and it is my impression that observing your demeanor during the trial, the pretrials beforehand including what you have to say here today, *you are committed, committed to the idea that you have done absolutely no wrong here*, including getting in that car, *you won't even admit that*, which was a bad decision, not necessarily an illegal one, but it was a bad decision; *but you don't even admit that you got in the car. You don't even admit that you were the person over there on the street where this killing took place* with the clothing on that the witnesses described that you had on. And the police, they gave that description to the police, and immediately the police go around the corner and they find the person wearing those clothes and low [sic] and behold it was you, *but you don't even admit that. You denied every morsel of evidence in this case* which lets me know that you have no remorse, none, no remorse.

*Id*. at 23-24.[8] These comments were prefaced by the trial judge's comments explicitly faulting

---

[8]In addition, the prosecutor explicitly argued that petitioner's failure to admit guilt was a basis for the court to sentence petitioner in the high end of the guidelines or exceed the guidelines. *See* Sentence Tr., at 18-19 ("[H]e still thinks he did nothing wrong. He's not admitting to doing anything wrong. . . . His testimony was that he didn't do any shooting, things of that nature, that other people

76

petitioner for refusing to follow the advice of his attorneys and accept a plea deal. *See id*. at 22.

The entirety of the sentencing proceeding, including both the prosecutor's arguments to the court and the court's own statements, allow only one reasonable conclusion: that the court based its departure from the guidelines and the sentence it imposed in significant part on petitioner's exercise of his right to a trial and continued refusal to admit guilt. As in *Ketchings*, any contrary reading of the record is simply an unreasonable determination of the facts. *See Ketchings*, 365 F.3d at 512; 28 U.S.C. § 2254(d)(2). Therefore, as in *Ketchings*, the court of appeals's decision upholding petitioner's sentence was an unreasonable application of clearly established federal law.[9] Accordingly, the Court should conclude that petitioner is entitled to habeas relief on this claim, and should grant a conditional writ ordering the state to release petitioner if it does not resentence him before another judge within 180 days of the Court's order. *See Ketchings v. Jackson*, No. 01-73141, at 45, 51 (E.D. Mich. Dec. 6, 2002) (Edmunds, J.).

### b. Exhaustion

On a final note, respondent contends that petitioner is not eligible for habeas relief on this claim because the claim is unexhausted. Respondent argues that petitioner's claim is based on *Mitchell*, but "[h]is brief at the Michigan Court of Appeals did not reference *Mitchell* or any other Supreme Court case, or even any case from the lower federal courts. Petitioner instead based his

---

were doing the shooting. He is just totally in a state of mind that I didn't do anything wrong, I don't even know why I'm here.").

[9]Petitioner argues that Judge Edmunds's decision in *Ketchings* constitutes law of the case which is binding here. This argument is doubtful. Petitioner also argues that, because the cases arise from a common set of facts and involve identical issues, the Equal Protection Clause requires that he be treated the same as his codefendant. I express no opinion on these matters. It is sufficient to resolve petitioner's claim that (a) the Sixth Circuit's *Ketchings* decision constitutes binding precedent which this Court is obligated to follow, and (b) the decision is indistinguishable from the facts of this case.

argument entirely on State cases predating *Mitchell* by a decade or more." Answer, at 32. The Court should reject this argument, and conclude that petitioner's claim is properly exhausted. Contrary to respondent's argument, petitioner's failure to cite *Mitchell* or any other federal court decision does not render his claim unexhausted. The exhaustion doctrine requires only that a habeas petitioner exhaust his habeas claims, not that he exhaust his discussion of potentially relevant precedent. As the Supreme Court has explained, a petitioner need have done no more than "'fairly presented' to the State courts the 'substance' of his federal habeas corpus claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). To satisfy this obligation, a petitioner need not cite "book and verse of the federal constitution." *Picard*, 404 U.S. at 278 (internal quotation omitted). For this reason, the Sixth Circuit has explained that

> [a] petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."

*Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003) (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

Here, a review of petitioner's brief in the Michigan Court of Appeals reveals that petitioner adequately alerted the state courts to the factual and legal bases of his federal constitutional claim. In presenting his claim, petitioner relied extensively on *People v. Yennior*, 72 Mich. App. 35, 248 N.W.2d 680 (1976), *summarily rev'd*, 399 Mich. 892 (1977). *Yennior* discussed the distinction between reliance on a defendant's failure to admit guilt, which is improper, and reliance on a defendant's lack of remorse, which is proper. Although the *Yennior* court did not itself use

78

explicitly constitutional language, its discussion of the issue focused on cases which themselves employed a federal constitutional analysis, including *People v. Bottany*, 43 Mich. App 375, 204 N.W.2d 230 (1972) and *Scott v. United States*, 419 F.2d 264 (D.C. Cir. 1969). And *Bottany*, in turn, likewise relied on cases employing a federal constitutional analysis, including *Scott*, *Thomas v. United States*, 368 F.3d 941 (5th Cir. 1966), and *Poteet v. Fauver*, 512 F.2d 393 (3d Cir. 1975). And, indeed, the Michigan Court of Appeals has been more explicit in recent years in viewing the *Yennior* rule as a Fifth Amendment self-incrimination rule. *See, e.g.*, *People v. Conley*, 270 Mich. App. 301, 314, 715 N.W.2d 377, 385-86 (2006). In these circumstances, the Court should conclude that petitioner sufficiently apprised the state courts of the federal constitutional nature of his claim giving those courts a fair opportunity to address the claim.

Further, even if petitioner's state court pleadings are construed as raising only a claim under state law, the Court should nonetheless conclude that the claim is exhausted. In this case, the Michigan rule reflected in *Yennior* is not merely "somewhat similar" to the federal claim, *see Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam), but is identical to the Fifth Amendment rule reflected in *Mitchell*. "An individual's claim, arising under and asserted in terms of state law, may, as a practical matter, be indistinguishable from one arising under federal law. If, in fact, the claims are functionally identical-a point of more than trifling concern-we must regard the federal claim as fairly presented." *Nadworny v. Fair*, 872 F.2d 1093, 1099-1100 (1st Cir. 1989) (citing *Picard*, 404 U.S. at 277 (where ultimate question for disposition will be the same, the claim is exhausted)); *see also*, *Evans v. Court of Common Pleas, Delaware County*, 959 F.2d 1227, 1232 (3d Cir. 1992); *cf. Howell v. Mississippi*, 543 U.S. 440, 444 (2005) ("Assuming, without deciding, that identical standards might overcome a petitioner's failure to identify his claim as federal . . .").

79

In short, the Court should conclude that petitioner's sentencing claim is exhausted, and that the Michigan Court of Appeals's rejection of that claim was an unreasonable application of federal law. Accordingly, the Court should grant petitioner's habeas application with respect to this claim.

L.     *Counsel Claims (Claims I, XI & XIV)*

Finally, petitioner raises several claims relating to his counsel at trial. First, petitioner claims that he was denied his right to counsel of his choice when his retained counsel was allowed to withdraw. Second, he contends that his trial counsel was ineffective for failing to request a manslaughter instruction and for failing to investigate and present a defense. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Denial of Counsel of Choice (Claim I)*

a. *Clearly Established Law*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. This right contemplates a corollary right to the counsel of one's choice, and thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). However, "[a]lthough the Sixth Amendment contemplates a right to counsel of choice, that right is generally cognizable only to the extent defendant can retain counsel with private funds; an indigent defendant does not have an absolute right to choose appointed counsel." *Haynie v. Furlong*, No. 98-1177, 1999 WL 80144, at *1 (10th Cir. Feb. 17, 1999). As the Supreme Court has recently explained, "the right to counsel of choice does not extend to defendants who require counsel

to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006).  Further, the

right to counsel of one's choice is not absolute, and "is circumscribed in several important respects."

*Wheat v. United States*, 486 U.S. 153, 159 (1988).  Importantly, the right to counsel of one's choice

"must be balanced against the court's authority to control its own docket, and a court must beware

that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court."

*United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988); *see also*, *Lockett v. Arn*, 740 F.2d

407, 413 (6th Cir. 1984) ("Although a criminal defendant is entitled to a reasonable opportunity to

obtain counsel of his choice, the exercise of that right must be balanced against the court's authority

to control its docket.").

### b.  Analysis

On the day the jury was selected, petitioner's retained counsel sought to withdraw.  Counsel

indicated that because of his extensive involvement in plea negotiations with the prosecutor and the

refusal of petitioner and his family to abide by his advice, he felt that his "heart wasn't in it," that

he was unable to proceed, and that petitioner would be better served with another attorney.  *See* Mot.

Tr., dated 7/31/96, at 4-6.  The trial judge asked petitioner for his view, and petitioner indicated that

"I know if he don't want to go through with it, then I probably should get somebody else."  *Id*. at

7.  The trial court granted the motion, and gave petitioner an opportunity to secure new retained

counsel.  Petitioner ultimately failed to secure new retained counsel, and the court appointed an

attorney to represent petitioner.  Petitioner contends that, by allowing his retained counsel to

withdraw, he was deprived of his Sixth Amendment right to counsel of his choice.  The Court should

conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner cannot show that he was denied his right to counsel of his choice because the trial

court did not deprive petitioner of his retained counsel's services.  "The Sixth Amendment requires only that the defendant be given a fair or reasonable opportunity to obtain particular counsel; it does not guarantee an absolute right to the counsel of one's choice."  *United States v. Paternostro*, 966 F.2d 907, 912 (5th Cir. 1992); *see also*, *Gonzalez-Lopez*, 548 U.S. at 144; *United States v. Baker*, 432 F.3d 1189, 1248 (11th Cir. 2005).  Here, petitioner was not deprived of a fair and reasonable opportunity to secure counsel of his choice.  He had retained counsel, but counsel himself sought to withdraw.  Neither the court nor the prosecutor in any way restrained or interfered with petitioner's exercise of his right to counsel.  Further, petitioner was given time following the withdrawal to secure new retained counsel.  Petitioner has cited, and I have found, not a single case suggesting that a defense counsel's voluntary withdrawal from a case alone implicates the Sixth Amendment right to choice of counsel.[10]  On the contrary, a criminal defendant has no right to "insist upon being represented by an attorney who declines to represent him."  *People v. Howard*, 876 N.E.2d 36, 46 (Ill. Ct. App. 2007); *see also*, *Wheat*, 486 U.S. at 159 ("[A] defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant.").  Here, trial counsel sought to withdraw of his own accord, and petitioner was granted a reasonable amount of time to attempt to retain new counsel.  In these circumstances, petitioner cannot show that he was denied his Sixth Amendment right to counsel of his choice.  *See Ringer v. Quarterman*, 4:07-CV-501-A, 2009 WL 35059, at *5 (N.D. Tex. Jan. 6, 2009); *Carvajal*

---

[10]To be sure, there is a significant body of caselaw addressing the propriety of a trial court refusing to let counsel withdraw or be replaced by a defendant.  There are also general rule-based standards courts apply in deciding whether to permit counsel to withdraw, but these cases do not purport to decide any constitutional matters under the Sixth Amendment.  Further, it is irrelevant whether counsel's withdrawal may have violated any ethical obligations owed by counsel to petitioner; the Sixth Amendment does not codify any canon of ethics or code of professional responsibility.  *Cf. Nix v. Whiteside*, 475 U.S. 157, 165 (1986).

*v. Artus*, No. 07 Civ. 10634, 2008 WL 4555531, at *42 (S.D.N.Y. Oct. 10, 2008).[11]

In short petitioner has pointed to no law, much less clearly established law under § 2254(d), which supports his claim that counsel's voluntary withdrawal violated his Sixth Amendment right to the counsel of his choice. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.    *Ineffective Assistance of Counsel (Claims XI & XIV)*

Petitioner also claims that his counsel at trial rendered constitutionally ineffective assistance. Specifically, petitioner contends that counsel was ineffective for failing to request a voluntary manslaughter instruction (Claim XI) and for failing to investigate petitioner's alibi defense (Claim XIV). The Court should conclude that petitioner is not entitled to habeas relief on these claims.

a.  *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To

---

[11]Although there is no Supreme Court precedent directly on point, *Wheat* supports this conclusion. In *Wheat*, the Court held that the defendant was not denied his right to counsel of his choice when the trial court refused to allow him to proceed with an attorney who was also representing his codefendants, despite the defendant's waiver of any conflict of interest. The Court explained that trial courts confronted with such a situation "face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule," with a defendant later claiming ineffective assistance of counsel if the joint representation is allowed or claiming denial of the right to choice of counsel if the joint representation is not allowed. *Wheat*, 486 U.S. at 161. Similarly, here counsel repeatedly and vehemently stated that he could not adequately represent petitioner, and had counsel not been permitted to withdraw petitioner would likely now be claiming that counsel's statements indicate that he was ineffective. "Whatever his underlying reasons for doing so, [counsel's] insistence on withdrawal raised legitimate concerns about his inclination and ability to effectively represent [petitioner]. . . . Faced with a recalcitrant attorney and a seemingly indifferent defendant, the trial court rationally could conclude that the integrity and fairness of the defendant's trial were at stake." *Howard*, 876 N.E.2d at 52; *see also*, *Gonzalez-Lopez*, 548 U.S. at 152 (quoting *Wheat*, 486 U.S. at 160) (explaining that a trial court has "wide latitude in balancing the right to counsel of choice against the needs of fairness," and that the trial court has "an 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'" ).

establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

### b. Failure to Request Manslaughter Instruction (Claim XI)

Petitioner contends that counsel was ineffective for failing to request a voluntary manslaughter instruction in light of the jury's notes to the court. As explained above, however, and as the Michigan Court of Appeals concluded, a voluntary manslaughter instruction was not

84

warranted by the evidence as a matter of state law.  In analyzing petitioner's ineffective assistance

of counsel claims, this expression of state law is binding on this Court.  *See Basile v. Bowersox*, 125

F. Supp. 2d 930, 960 (E.D. Mo. 1999).  *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68

(1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a

state appellate court is . . . binding in a federal habeas action.").  Counsel cannot be deemed

ineffective for failing to request an instruction which was not appropriate under state law.  *See*

*Mitzel v. Tate*, 267 F.3d 524, 538 (6th Cir. 2001).  Accordingly, the Court should conclude that

petitioner is not entitled to habeas relief on this claim.

### c.  Failure to Investigate Alibi Defense (Claim XIV)

Petitioner next contends that his counsel was ineffective for failing to adequately investigate

the alibi defense and interview his alibi witnesses.  The Court should conclude that petitioner is not

entitled to habeas relief on this claim, for two reasons.

First, as respondent correctly argues, petitioner's claim is time-barred.  The AEDPA imposes

a one-year statute of limitations on habeas claims, usually running from the date the conviction

becomes final, and excluding through tolling any time spent pursuing state postconviction relief.

*See* 28 U.S.C. § 2244(d)(1)(A), (2).  Petitioner does not dispute that this ineffective assistance claim,

which was first raised in his amended petition, was filed outside of the one-year limitations period.

Rather, petitioner contends that the claim "relates back" to the filing of his original petition under

FED. R. CIV. P. 15(c), and thus is timely.  The Court should disagree.  Under Rule 15(c), an

amendment to a pleading relates back to the filing date of the original pleading if the claims arise

out of the same "conduct, transaction, or occurrence."  FED. R. CIV. P. 15(c)(2).  In *Mayle v. Felix*,

545 U.S. 644 (2005), the Court held that although Rule 15(c)(2) generally applies in habeas corpus

actions, it must be interpreted in light of the pleading requirements governing habeas actions set

forth in Rule 2, 28 U.S.C. foll. § 2254, which are generally stricter than the notice pleading

requirements set forth in FED. R. CIV. P. 8(a) applicable to ordinary civil litigation, as well as in light

of the purposes served by the limitations provision. *See Mayle*, 545 U.S. at 655-57, 662-63. The

Court held that relation back is appropriate when the claims "are tied to a common core of operative

facts," *id*. at 664, and adopting the test applied by the majority of courts of appeals explained that

relation back is allowed "only when the claims added by amendment arise from the same core facts

as the timely filed claims, and not when the new claims depend upon events separate in both time

and type from the originally raised episodes." *Id*. at 657.

Petitioner does not contend that the claims arise from a common core of operative facts

merely because they all arise from his conviction, nor could he. *See Mayle*, 545 U.S. at 662 ("If

claims asserted after the one-year period could be revived simply because they relate to the same

trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim

significance."). Nor does petitioner contend that his newly asserted ineffective assistance claim

arises from the same operative facts as his originally pleaded ineffective assistance claim, and again

such an argument would be meritless. "[A] petitioner does not satisfy the Rule 15 'relation back'

standard merely by raising some type of ineffective assistance in the original pleading, and then

amending the petition to assert another ineffective assistance claim based upon an entirely distinct

type of attorney misfeasance." *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005); *see also*,

*United States v. Hernandez*, 436 F.3d 851, 857 (8th Cir. 2006). Rather, petitioner contends in his

reply that his claim arises from the same operative facts as his second habeas claim, alleging that

he was denied a fair trial by the trial court's failure to grant a continuance so that he could obtain

transcripts of the witnesses in the codefendants' trials.  The Court should disagree.

Petitioner's second habeas claim alleges that he was denied a fair trial because the trial court declined to grant a mistrial so that counsel could obtain transcripts from prior proceedings, which would have been useful in impeaching the witnesses.  Petitioner did not in any way characterize this claim as impacting the effectiveness of his counsel's assistance.  In his newly asserted habeas claim, petitioner does not assert that counsel was ineffective for failing to properly cross-examine these witnesses or impeach them with prior testimony, but that counsel failed to interview these witnesses. Petitioner claims that "[t]he named and uninterviewed 'alibi' witnesses were questioned by defense counsel and provided no support for the alibi defense," Pet'r's Amended Br., at 87, that the prosecutor took advantage of this fact during closing argument, *see id.*, and that "[i]f the investigation would have shown the alibi witness to be untruthful and the defense not valid, then failure to investigate coupled with the continued presentation of an alibi defense to the jury constitutes ineffective assistance of counsel." *Id.* at 89.  This claim does not relate in any way to the trial court's failure to grant a continuance or the absence of potentially impeaching prior testimony, but only to counsel's alleged failure to interview the witnesses to find out what they would have to say.  Accordingly, the Court should conclude that the amended claim does not relate back to the filing of the original petition, and is therefore untimely.

Alternatively, if the Court concludes that the claim is timely, the Court should conclude that the claim is without merit.  Petitioner does not contend that counsel's ineffectiveness caused him to lose an alibi defense that was available to him.  That is, petitioner does not contend that had counsel conducted a proper investigation he would have uncovered a witness who would have supported petitioner's alibi defense.  Thus cases such as *Luna v. Cambra*, 306 F.3d 954, 961 (9th

Cir. 2002), *Lord v. Wood*, 184 F.3d 1083, 1096 (9th Cir. 1999), and *Brown v. Myers*, 137 F.3d 1154, 1158 (9th Cir. 1998), upon which petitioner relies, are inapposite. Rather, petitioner contends that an adequate investigation would have shown that the alibi defense was meritless, and thus counsel would not have presented the defense to the jury.

Petitioner's alibi defense was based on petitioner's own testimony, and was at least partially supported by the inability of various witnesses to identify him. Importantly, although counsel listed two witnesses as potential alibi witnesses on the notice of alibi, counsel himself did not inform the jury that he would call any particular alibi witnesses. It is true that the prosecutor referenced the alibi notice and petitioner's failure to call alibi witnesses, but counsel responded that the alibi was supported by some witnesses and that, in any event, petitioner did not bear the burden of proof. More fundamentally, petitioner cannot show a reasonable probability that, but for the listing of these two witnesses on the alibi notice, the result of the proceeding would have been different. In *Johnson v. Baldwin*, 114 F.3d 835 (9th Cir. 1997), upon which petitioner relies, the court found that counsel was ineffective for failing to interview witnesses to corroborate the petitioner's alibi defense, which investigation would have shown that petitioner's testimony was unconvincing. Further, the court found that petitioner was prejudiced because the government's case was extremely weak, and the jury likely would have acquitted petitioner but for the obvious false testimony which he gave. As the court explained, the jury's adverse assessment of the petitioner's credibility likely tipped the weak evidence against him. *See id.* at 840.

Here, on the contrary, there was plenty of evidence against petitioner apart from any adverse inference the jury drew from concluding that petitioner's alibi testimony was not truthful. A number of witnesses placed petitioner either in the car or firing the gun, and petitioner himself gave

statements to the police indicating that he was in the vehicle.  Even in the absence of any testimony from petitioner, or the absence of any indication to the jury that petitioner's alibi witnesses did not support his alibi, there is not a reasonable probability that the jury would have come to a different conclusion regarding petitioner's presence at the scene and involvement in the shooting.  *See, e.g.*, *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2004) ("*Johnson* is inapposite, however, because there, the defense would likely have secured a not-guilty verdict if only the defendant had not taken the stand and obviously lied.  Allen would not have enjoyed a similar security in not testifying."); *Wilson v. Henry*, 185 F.3d 986, 989 (9th Cir. 1999) ("Unlike in *Johnson*, the state's case against Wilson was strong.").  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

M.     *Conclusion*

In view of the foregoing, the Court should conclude that the Michigan Court of Appeals unreasonably applied clearly established federal law in rejecting petitioner's claim that the trial court increased his sentence based on his refusal to admit guilt in violation of his Fifth Amendment privilege against self-incrimination.  The Court should therefore grant a conditional writ of habeas corpus, ordering the State to release petitioner if it does not provide him a new sentencing proceeding before another judge within 180 days of the Court's order.  In all other respects, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus in all other respects.

III.     <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

89

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                        s/Paul J. Komives
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE
Dated: 6/26/09

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record   by electronic means or U.S. Mail on June 26, 2009.
>
>                       s/Eddrey Butts
>                       Case Manager